86 N.J. Super. 29 (1964)
205 A.2d 762
FRANK SCHULTS, JR., A MINOR BY FRANK SCHULTS, HIS FATHER AND NEXT FRIEND, ET AL., PLAINTIFFS-APPELLANTS,
v.
BOARD OF EDUCATION OF THE TOWNSHIP OF TEANECK, BERGEN COUNTY, NEW JERSEY, ET AL., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued December 7, 1964.
Decided December 18, 1964.
*31 Before Judges GOLDMANN, SULLIVAN and LABRECQUE.
Mr. Milton T. Lasher argued the cause for appellants.
Mr. Irving C. Evers argued the cause for respondents (Messrs. Parisi, Evers & Greenfield, attorneys).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Plaintiffs appeal from a Law Division judgment dismissing their complaint, entered on defendants' motion to strike. The trial court held that plaintiffs had failed to exhaust their administrative remedies and the matter was one which should be heard and determined by the Commissioner of Education. The case involves an attempt by plaintiffs to enforce the neighborhood school concept, as opposed to a plan by the Board of Education of Teaneck Township ("board") to achieve better racial balance and use of local school facilities.

I.
Since October 1961 the board had had under constant discussion the problems posed by the marked increase in Negro pupils in two of its elementary schools, Washington Irving and William Cullen Bryant. A March 1962 study of the concentration of Negro children in the Teaneck Township school system showed that it was about 25% in Washington Irving and 36% in William Cullen Bryant. Two years later a further study disclosed that the percentages had increased to 40% and 54%, respectively. According to the superintendent of schools, if the increase in concentration continued, it was anticipated that the Bryant percentage would reach 72% by 1966.
In June 1962 the board adopted a program known as the Voluntary Optional Pupil Transfer Plan, effective beginning *32 in September of that year. Only five or six pupils took advantage of this program, so that in May 1963 the board modified the plan, effective the following fall. In the meantime, the board continued its studies of the school situation. In December 1963 it mailed to all taxpayers a publication noting the studies being made of the problem of racial imbalance and listing three possible courses of action to meet it. The first of these was the plan described below. During the period when the board was considering what action should be taken, and between November 1963 and January 1964, some 30 citizens and citizen groups submitted plans for integration.
At a public meeting held on May 13, 1964 the board, by a vote of 7-2, adopted a resolution establishing a program designed to improve educational opportunities in the township.
The resolution read:
"WHEREAS, Teaneck has enjoyed a long and distinguished reputation for its desire to provide a sound educational program for its total school population, and
WHEREAS, Teaneck as a total community is becoming more complex in its heterogeneity of people, interests and backgrounds, and
WHEREAS, The Teaneck Board of Education has the legal responsibility to promote equality of education for all the children of Teaneck, and
WHEREAS, The Teaneck Board of Education believes it should organize the school program to best utilize the space provided, the strengths and interests of its various faculty members as well as enhance the learning potentialities of the children in the community, now therefore be it
RESOLVED, That beginning September 1, 1964, the Teaneck Board of Education initiate a program entitled `Improvement of Educational Opportunity' to include the following 
1. Initiate a Central School for all sixth grade pupils in the Bryant School.
2. Increase the Washington Irving School district to include those children living within the area bounded by the west side of Teaneck Road, including both sides of State Street and Terrace Circle on the north, and west to the Railroad tracks, thence southerly to West Englewood Avenue.

*33 3. Assign all pupils in the Bryant School district in grades one through five to the several elementary schools of the Township in accordance with the `Assignment Policy.'
4. Maintain a continuous evaluation of the new program and give a comprehensive review two years hence with a view to taking any further action which may appear necessary at that time."
The "Assignment Policy" to implement the plan, mentioned in paragraph 3 of the resolution, provided, among other things, that children in grades 1 through 5 living in the William Cullen Bryant school district were to be assigned in accordance with the following criteria: (1) all children were to be assigned to the several elementary schools with the intention that they remain in those schools through the 5th grade; (2) seats available within room maxima were to guide the first year's assignment, the maxima to be subject to change as need warranted in terms of the number to be accommodated and building limitations; (3) seats available within a given school must accommodate all of the children from the same family; and (4) pupils were to be assigned alphabetically, beginning with school No. 1 and proceeding to schools Nos. 3, 4, 5, 7 and 8, in that order. An "addenda" to the resolution recommended that children assigned to the eight elementary schools of the township, whose homes were more than 1.2 miles distant by accepted streets from the school to which they were assigned, be eligible for transportation as provided by the board of education, and the secretary to the board was requested to prepare appropriate resolutions with a view to establishing bus lines and entering into contractual arrangements. The superintendent of schools and the secretary were requested to recommend to the board, in September 1964, budgetary arrangements to cover the cost of the new plan.
On June 5, 1964 a complaint was filed attacking the May 13 action taken by the board. Plaintiff Frank Schults, Jr., suing by his father and next friend, alleges that he attended the 3rd grade in William Cullen Bryant, the public school serving the neighborhood in which he resides, during the 1963-64 school year, and would be eligible to continue in the 4th grade *34 in that school but for the adoption of the proposed plan. The remaining individual plaintiffs claim to be taxpayers. Plaintiff Neighborhood School Association of Teaneck, New Jersey, Inc., claims to be an organization composed of parents or residents of the township, "formed for the purpose of preserving and promoting the neighborhood school concept in Teaneck, New Jersey, as the best means of providing high quality education for all of the children of this community."
The complaint alleges that pupils otherwise eligible to attend William Cullen Bryant will be compelled from September 1964 on to attend a public school out of their neighborhood. Paragraph 5 states that this will "jeopardize their safety, deprive them of the right to eat lunch at home, destroy an important element of family rapport, increase the period of time during which they will be under neither parental or school supervision, will deprive them of their constitutional and statutory rights to attend a public school convenient of access, and will unconstitutionally discriminate against and deny them of the equal protection of the law enjoyed by other children attending the public schools of the Township of Teaneck in their respective neighborhoods." Paragraph 6 alleges that no provision was made in the 1964-65 school budget for bus transportation and other related costs necessary to carry out the "Assignment Policy." And paragraph 8 charges that the board action of May 13, 1964 is illegal and void and should be set aside as arbitrary and an abuse of discretion and breach of faith. The reasons assigned for this conclusion are that the resolution was agreed upon in advance and was not made known to the two minority members of the nine-man board until they met on the evening of May 12, or to the public until the evening of the May 13 public meeting. Further, it is alleged that at various times prior to May 13 representations were made to the public by members of the majority that no plan was contemplated for the next school year which would incur bus transportation costs for the school district beyond those required under the previously existing bus transportation policy. The proposed plan is characterized as a *35 scheme to circumvent the will of the majority of the electorate as expressed in the last school election, and one which will result in a diversion of tax monies raised for educational purposes. Finally, paragraph 8 alleges that the expenditures to be incurred are not authorized by statute and have not been approved by the voters of the school district.
An order to show cause issued upon the filing of the complaint, returnable June 19, 1964 and enjoining defendants from taking any action pursuant to the May 13 resolution. Defendants at once filed a notice of motion for an order to strike the complaint for failure to exhaust administrative remedies, and to strike the Neighborhood School Association as plaintiff because it was not a proper party to the action.
The two minority members of the board filed affidavits stating that the first time the resolution was brought to their attention was at a special conference of the board which they attended on the evening of May 12, 1964. They deposed that the taxpayers and voters of the district had been assured by, among others, the board president, at the 1964 school budget hearing that no plan had yet been formulated and none was being considered which contemplated additional expenditures for bus transportation; that although the 1964-65 school budget limited bus transportation expenditures to $30,500, the proposed plan would require an additional expenditure in excess of $40,000.
The superintendent of schools filed a counter-affidavit setting out the facts recited above regarding the studies that had been made of the concentration of Negro children in the Teaneck school system, the constant discussion of the problem by the board since 1961, the failure of the Voluntary Optional Proposal Transfer Program, the publicizing of the three plans under consideration by the board, and the final adoption of the plan here under attack. Although the superintendent states that the plan is one which provides for "a more equitable and educationally beneficial utilization of space, personnel and facilities," and that "the dominant purpose of the plan is not racial in origin, although racial distribution is a *36 by-product of it," it would appear that the latter is the prime motivation and the former the by-product.
The affidavit of the superintendent, like that of the board president, categorically denies the allegations of paragraph 5 of the complaint, and states (contrary to paragraph 6) that there are funds available in the budget which can be utilized for bus transportation to carry out the new program. The president's affidavit denies that the board action was the result of a private meeting, as charged by paragraph 8 of the complaint, and asserts it was taken at the public meeting on the evening of May 13. He denies that the board took any action which, by way of policy, represented that no plan was contemplated for the next year which would incur transportation costs beyond those required under the existing bus transportation policy, and states that whatever comments or statements may have been made by individual members did not constitute action by the board. Expenditures of any monies required under the plan, says the board president, will be strictly for educational purposes, and do not require statutory authorization or specific approval by the voters of the school district.
Following argument on the return day of the order to show cause and of the notice of motion to strike, the Law Division judge delivered a carefully considered opinion dismissing the complaint for failure of plaintiffs to exhaust their administrative remedies. They appeal the resulting order.

II.
Plaintiffs contend that the present case presents constitutional issues which are judicial questions to be determined by the court and not by the Commissioner of Education. They claim that the plan proposed by the May 13 resolution will unconstitutionally deprive children living in the Bryant school district, who would otherwise be eligible to attend grades 1 through 5, of their right to attend that school as the school of their neighborhood. All other children attending those *37 grades and residing in the remaining districts of the township will continue to attend their neighborhood schools. This, it is claimed, amounts to discrimination against the Bryant children and violates the equal protection clause of the Fourteenth Amendment to the United States Constitution. Bell v. School City of Gary, Indiana, 213 F. Supp. 819 (N.D. Ind. 1963), affirmed 324 F.2d 209 (7 Cir. 1963), certiorari denied 377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed.2d 216 (1964), is cited in support. Plaintiffs further contend that the Teaneck plan contravenes R.S. 18:11-1, which requires each school district to provide "suitable school facilities and accommodations for all children who reside in the district and desire to attend the public schools therein." They claim that the legislative policy so projected cannot be diluted by the courts, the State Department of Education or the Commissioner of Education. We find both arguments unacceptable.
The so-called "neighborhood school" concept embodied in R.S. 18:11-1 is not so immutable as to admit of no exceptions whatsoever. In Morean v. Board of Education of Montclair, 42 N.J. 237 (1964), defendant board's studies showed that the percentage of Negro students in Glenfield Junior High School, one of the four in Montclair, was 90%. Following the coming in of a definitive report, and after a public hearing, the board concluded that a single junior high school was a goal which was educationally sound and economically feasible, and that steps should be taken forthwith for its ultimate attainment by 1966. As a first step, the board announced a plan for relocating the Glenfield pupils among the other three junior high schools. Parents were asked to state their first, second and third choices; pupils were then assigned by lottery to their first choice as long as space remained available, then to the second choice, and finally the third.
A petition for relief was filed with the State Commissioner of Education by five students, alleging that the Montclair board had adopted a "double standard of school assignment" by applying the neighborhood school policy throughout Montclair but not as to the residents of the Glenfield Junior High *38 zone, thereby depriving them of the equal protection of the laws guaranteed by the Fourteenth Amendment. A motion challenging the Commissioner's jurisdiction was determined adversely to the petitioners. The Commissioner concluded that the board action was neither arbitrary nor unreasonable, and that it had acted well within the discretionary authority granted it by our school laws. He stated that while the plan for relocating the Glenfield pupils pending establishment of a single junior high school took racial discrimination into account, its effect was "to minimize rather than amplify any undesirable results that might accrue." The Commissioner rejected petitioners' contention that the adoption of even a temporary plan dealing with the Glenfield pupils in a manner different from other junior high school pupils was unconstitutionally discriminatory, and dismissed the petition. His action was affirmed by the State Board of Education. Petitioners then appealed to this court and the Supreme Court certified the matter before argument here.
In affirming, the Supreme Court rejected the contention that Montclair's plan deprived petitioners of the equal protection of the laws. It said:
"The Montclair Board's obligation was to maintain a sound educational system by the furnishment of suitable school facilities and equal educational opportunities. It could not, consistently with either sound legal principles or with sound educational practices, maintain an official policy of segregation with its inherent inequalities of educational opportunities and its withholding of the democratic and educational advantages of heterogeneous student populations. See Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955); N.J. Const. Art. I, par. 5; N.J.S.A. 18:14-2, 18:25-4, 18:25-5. Nor need it close its eyes to racial imbalance in its schools which, though fortuitous in origin, presents much the same disadvantages as are presented by segregated schools. [citing cases]" (42 N.J., at pages 242-243)
and, further,
"* * * The Board's action was reasonable and there is no substance to the petitioners' contention that since its plan of relocation had some racial motivation it was violative of the fourteenth amendment. The motivation was to avoid creating a situation at Hillside *39 which would deprive the pupils there of equal educational opportunities and subject them to the harmful consequences of practical segregation. Constitutional color blindness may be wholly apt when the frame of reference is an attack on official efforts toward segregation; it is not generally apt when the attack is on official efforts toward the avoidance of segregation. The moving purpose of the Montclair Board and its fulfillment in the manner here may not sensibly be viewed as violative of the fourteenth amendment; to us the Board's action appears clearly to have been in sympathetic furtherance of the letter and spirit of the amendment and in fair fulfillment of the high educational functions entrusted to it by law." (Ibid., at pages 243-244)
The Morean result clearly runs counter to plaintiffs' reliance upon the neighborhood school concept of R.S. 18:11-1.
As early as Pierce v. Union District School Trustees, 46 N.J.L. 76, 78 (Sup. Ct. 1884), affirmed o.b. 47 N.J.L. 348 (E. & A. 1885), the court, although holding that the relator was entitled to have his children educated in the public school nearest his residence, added the significant language, "unless there was some just reason for sending them elsewhere." In Walker v. Board of Education of Englewood (Div. Against Discrimination 1955), the Commissioner of Education, in pointing out that there are valid reasons for assigning pupils to schools other than those nearest to their homes, observed that "The principle that a pupil must be permitted to attend the nearest school may be modified by safety factors, or need for special education on the part of the particular pupil, or the necessity for particular groupings, such as are to be found in junior and senior high schools."
The Legislature has specifically provided for sending certain children out of their neighborhoods to attend special schools where proper training can be obtained. Thus, under N.J.S.A. 18:14-71.5, it is the duty of every board of education to provide suitable facilities and programs of education or training for all children who are classified as educable or trainable under L. 1954, c. 178. Similar provisions for physically handicapped pupils may be found in N.J.S.A. 18:14-71.22 and 71.23, and for emotionally disturbed or socially maladjusted pupils under N.J.S.A. 18:14-71.39.
*40 It lies within the discretion of a local board of education to discontinue the use of any one of its schools. Boult v. Board of Education of Passaic, 135 N.J.L. 329 (Sup. Ct. 1947), affirmed 136 N.J.L. 521 (E. & A. 1948); Morean v. Board of Education of Montclair, above. Defendants properly observe that if a board has power to discontinue a school, may it not change the type of program offered in any school? For example, had the Teaneck board determined to change Bryant to a junior high school, its power to do so could not be challenged. The same conclusion must be reached in the present situation where the board, after careful consideration, concluded to convert Bryant to a central 6th grade school.

III.
We perceive no merit in the argument that the present case presents an unresolved constitutional question involving the equal protection clause. The development of the law in the area of school segregation, whether intentional or de facto, has moved logically forward from Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). We need go no further than Morean v. Board of Education of Montclair, from which we have quoted above, 42 N.J., at pages 242-244, and the cases therein cited, for an answer to plaintiffs' contention. The court there noted the contrary holding of the 7th Circuit in Bell v. School City of Gary, Indiana, above, 324 F.2d 209 (1963), in which the United States Supreme Court denied certiorari and upon which plaintiffs rely. Our highest court refused to follow that determination, and understandably so. The fact that the United States Supreme Court denied certiorari may not be taken as implying agreement with the holding of the 7th Circuit on the merits. In Bell, Negro students were seeking a declaratory judgment and an injunction to restrain the school district from operating and providing racially imbalanced public schools in Gary; here the Teaneck Board of Education has on its own determined to take action. Another distinction of *41 significance, as the Law Division judge observed, is that the plan adopted by the board can well be firmly based solely upon its obligation under the school laws and upon Art. I, par. 5, of the 1947 Constitution of New Jersey ("No person shall * * * be segregated in the * * * public schools, because of religious principles, race, color, ancestry or national origin"), wholly apart from any requirement under the Fourteenth Amendment to the United States Constitution.
In connection with the foregoing, see Fuller v. Volk, 230 F. Supp. 25, 33-34 (D.C.N.J. 1964), upholding the validity of a plan establishing a central 6th grade school in Englewood, N.J. Noting that racial considerations were a motivating factor in the formulation of the plan, the judge there observed that "the issue before this Court is not whether a local board of education must or is constitutionally required to act, but rather whether a board may or is not constitutionally prohibited from acting." After citing the Morean case, above, and Balaban v. Rubin, 20 App. Div.2d 438, 248 N.Y.S.2d 574 (App. Div. 1964), affirmed 14 N.Y.2d 193, 250 N.Y.S.2d 281, 199 N.E.2d 375 (Ct. App. 1964), certiorari denied 379 U.S. ___, 85 S.Ct. 148, 13 L.Ed.2d 87 (1964), he held that a local board of education is not constitutionally prohibited from taking race into account in drawing or redrawing school attendance lines for the purpose of reducing or eliminating de facto segregation in its public schools.
In short, we find that the constitutional question as to whether a local board of education may adopt a reasonable plan to resolve a de facto segregation situation, has already been decided contrary to plaintiffs' position.

IV.
The question remains whether plaintiffs could by-pass the Commissioner of Education and have the issues here involved determined by the Law Division without first exhausting their administrative remedies.
R.S. 18:3-14 provides that the Commissioner shall decide without costs to the parties "all controversies and disputes *42 arising under the school laws, or under the rules and regulations of the state board or of the commissioner." Decisions under that section are subject to appeal to the State Board of Education, N.J.S.A. 18:3-15. Plaintiffs urge that the Commissioner himself has recognized that he cannot decide constitutional questions, citing his decision in Fisher v. Board of Education of Orange, determined May 15, 1963, as supporting their position that this matter belongs in the courts. The argument they make here was advanced in the Fisher case and rejected. The Commissioner held that while he would apply constitutional principles to the determination of school controversies, he would not attempt to decide constitutional questions. And so in the Morean case, decided by the Commissioner on July 3, 1963, he stated that although he would not decide questions of constitutionality, he would be governed by constitutional limitations in his decisions and would, moreover, seek to construe the applicable statutes in a manner which will harmonize with those limitations.
As indicated, the constitutional principles here involved have already been decided, and all that the Commissioner need do is to apply them. The question he will resolve is whether the Teaneck plan is a reasonable one in light of our statutes and the Federal and State Constitutions  exactly the approach he used in the Morean case. In Fisher the Commissioner held that in view of the decision in Shepard v. Board of Education of Englewood, 207 F. Supp. 341 (D.C.N.J. 1962), and confronted with a controversy involving the proper administration of a school district, he would take cognizance of the dispute and make his determination in accordance with the application of educational principles and the school laws of New Jersey. This was consistent with his exercise of jurisdiction in Alston v. Board of Education of Union Township, April 7, 1964, affirmed by the State Board of Education July 8, 1964; Booker v. Board of Education of Plainfield, June 26, 1963, affirmed by the State Board February 5, 1964; and Spruill v. Board of Education of Englewood, July 1, 1963, affirmed by the State Board September 25, 1963.
*43 The Commissioner has struck down both intentional and de facto segregation and has refused to follow Bell v. School City of Gary, Indiana, above. Relying on our 1947 Constitution, Art. I, par. 5, and R.S. 18:11-1, the Commissioner has held to the view that state and local governments have the responsibility of taking whatever reasonable and practical means are available to eliminate racial imbalance in their schools. Although recognizing that the neighborhood school system is used in New Jersey, he has not considered that concept sacrosanct or one to be applied inflexibly when other considerations outweigh its value.
In Shepard v. Board of Education of Englewood, above, the court held that it could not agree with plaintiffs' contention that where the maintenance of a racially segregated school system is challenged, the exhaustion of state administrative remedies is not a prerequisite to the institution of an action in a federal court. Reading R.S. 18:3-14, quoted above, in conjunction with N.J.S.A. 18:14-2, which prohibits exclusion of a child from any public school on account of race, creed, color, national origin or ancestry, the judge there stated that R.S. 18:3-14 would appear to confer upon the Commissioner of Education jurisdiction to decide disputes involving racial discrimination in the public schools of New Jersey. He rejected the argument that the proceeding in question was judicial in nature and that the exhaustion doctrine did not apply  the same argument as is made here. He went on to say:
"Of course, a determination of the manner in which the `neighborhood school policy' operates in any particular community requires a consideration and evaluation of a multitude of factors. This Court feels that the Commissioner is especially well qualified, by reason of his knowledge and experience in the specialized field of education, to make these factual determinations. There is no reason to assume that the Commissioner, in the performance of his duty, will not be guided by the applicable legal principles. Under all of the circumstances, the Commissioner should be given the opportunity, at least in the first instance, to pass upon the matters set forth in plaintiffs' complaint. Until such time as plaintiffs have exhausted the state administrative *44 remedies provided by N.J.S.A. 18:3-14 and 15, this Court should not entertain the action." (207 F. Supp., at page 348)
R.R. 4:88-14 specifically provides that proceedings under R.R. 4:88 shall not be maintainable, so long as there is available administrative review in an administrative agency or tribunal which has not been exhausted. Plaintiffs cite Durgin v. Brown, 37 N.J. 189 (1962), as authority for the proposition that the exhaustion of administrative remedies is neither jurisdictional nor absolute in its terms. In that case present counsel for plaintiffs argued that the proceedings should first have been brought before the Commissioner of Education. The court agreed that the statutory scheme set out in R.S. 18:3-14 and N.J.S.A. 18:3-15 had been broadly construed to the end that the judiciary might have the benefit of the special experience of the administrative agencies operating in the important area of education. It then went on to say that the requirement of exhausting administrative remedies under R.R. 4:88-14 was neither jurisdictional nor absolute in its terms; the rule vests discretion in the trial court to determine whether the interests of justice require that the administrative process be by-passed. The need for a prompt solution, and the delaying moves which had already beset the school building program there involved, were deemed weighty considerations in favor of the court accepting the dispute. The court particularly noted that it had already in fact received the benefit of the expertise of the Commissioner of Education, so that "the public interest would not be served by rerunning the litigation."
Plaintiffs refer us to a number of cases in order to show that there is no occasion for invoking the exhaustion doctrine. They are all distinguishable. In Swede v. Clifton, 22 N.J. 303 (1956), the matter had already come before the Civil Service Commission before being appealed. Caldaro v. Ferber, 74 N.J. Super. 128 (App. Div. 1962), resulted in a reversal, 39 N.J. 314 (1963). The appellate court had held that where a matter depends solely upon the decision of a question of law, *45 the interests of justice do not require the exhaustion of administrative remedies before resort may be had to the courts. The Supreme Court disagreed in the circumstances there present, holding that plaintiffs should first have submitted their case to the Civil Service Commission. In Marranca v. Harbo, 76 N.J. Super. 429 (Law Div. 1962), affirmed in part and reversed in part (on other grounds), 41 N.J. 569 (1964), the court held that the Civil Service Department did not have jurisdiction to compel an appointing authority to exercise its discretion as to appointment or promotion to position, and that there was no need to resort to administrative remedies where such attempt would be futile because of the lack of an essentially administrative issue involving agency expertise and the absence of jurisdiction to grant the relief sought. Loboda v. Clark Tp., 74 N.J. Super. 159 (Law Div. 1962), affirmed 40 N.J. 424 (1963), held that the issue involved was solely one of law, and to require exhaustion of administrative remedies would result in needless delay. Finally, in Redcay v. State Board of Education, 128 N.J.L. 281 (Sup. Ct. 1942), resort had already been had to administrative procedures before the matter reached the court, and it was remanded to the State Board of Education for further consideration because of certain procedural irregularities.
Under the exhaustion of remedies argument plaintiffs contend that there are other issues which do not involve any expertise on the Commissioner's part. For example, they say that he may not disregard the neighborhood school policy set up by R.S. 18:11-1. We have already considered this point.
Plaintiffs also argue that their complaint involves an interpretation of the School Budget Law, N.J.S.A. 18:7-77.1 et seq., and the School Transportation Act, N.J.S.A. 18:14-8 et seq. These laws certainly call for the exercise and application of the Commissioner's expertise, for they involve interpretation of our school laws under R.S. 18:3-14.
N.J.S.A. 18:7-77.1 requires a local board of education to prepare a budget "in such detail and upon such forms as shall be prescribed by the Commissioner of Education by regulation." *46 The State Board of Education has prescribed such regulations. Rules and Regulations of the State Board of Education, § 9 (1964). In our view, the Commissioner is most qualified to determine whether a budget meets the requirements of those regulations, rather than the court.
N.J.S.A. 18:14-8.1 authorizes boards of education to provide transportation for school children in accordance with law and the rules and regulations of the State Board of Education. The State Board has promulgated such rules, set out in its publication, Transportation, New Jersey Handbook for Boards of Education and School Administrations, 1962. Here, again, the Commissioner is better qualified by reason of his expertise to pass upon the transportation questions raised by this case, and to do so before the matter is further considered by the courts.

V.
Plaintiffs' final argument is that the issues of "secret action by members of the Board, their asserted breach of trust and arbitrary action are clearly legal questions which are not within the peculiar field of competence of the State Board of Education." The foundation of this argument is that the May 13 resolution was agreed upon in advance by a majority of the board "at a private meeting." Not only was this charge categorically denied in the affidavit filed by the board president, but the fact is that the resolution was presented and discussed when the board members, including the two who voted against the resolution, met on the evening of May 12, 1964. Furthermore, the complaint admits that the resolution was voted upon at a public meeting held on May 13. There is nothing in the affidavits of the two minority members to indicate that the resolution was agreed upon on the evening of May 12. The board conference gave them full advance notice of the action proposed to be taken at the public meeting the next evening. We know of no prohibition against members of a public body holding a closed conference where no official *47 action is taken. Cf. Wolf v. Zoning Board of Adjustment, 79 N.J. Super. 546 (App. Div. 1963). What is prohibited by our laws is the taking of official action at other than a public meeting. N.J.S.A. 10:4-1 et seq. The complaint does not charge a violation of that law.
If there is anything to plaintiffs' claim of "secret action" by members of the board or their alleged "breach of trust," the Commissioner can well dispose of these factual questions when he deals with the other matters here raised.

VI.
In light of the existing decisions in the area of school segregation and the statutes to which we have referred, particularly R.S. 18:3-14 and N.J.S.A. 18:3-15, this entire controversy could have been accelerated and brought to a much earlier resolution had plaintiffs presented their cause to the Commissioner of Education and, if necessary, taken an appeal to the State Board of Education from any adverse decision he might make.
We hold the dismissal of the complaint to have been proper. The order of dismissal is affirmed.