257 N.J. Super. 413 (1992)
608 A.2d 914
BOARD OF EDUCATION OF THE BOROUGH OF ENGLEWOOD CLIFFS, BERGEN COUNTY, PETITIONER-CROSS-RESPONDENT/APPELLANT,
v.
BOARD OF EDUCATION OF THE CITY OF ENGLEWOOD, BERGEN COUNTY, RESPONDENT-CROSS-PETITIONER/CROSS-APPELLANT,
v.
BOARD OF EDUCATION OF THE BOROUGH OF TENAFLY, BERGEN COUNTY, CROSS-RESPONDENT/RESPONDENT, AND A.S., BY HER GUARDIAN AD LITEM, R.S., INTERVENOR/RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued December 17, 1991.
Decided June 15, 1992.
*421 Before Judges LONG, BAIME and THOMAS.
Joel D. Siegal argued the cause for appellant Board of Education of the Borough of Englewood Cliffs (Hellring, Lindeman, Goldstein & Siegal, attorneys, Joel D. Siegal, Robert S. Raymar, Ronnie F. Liebowitz, Bruce S. Etterman and Matthew E. Moloshok, on the brief).
Mary C. Jacobson, Deputy Attorney General, argued the cause for respondent State Board of Education (Robert J. Del Tufo, Attorney General, attorney, Mary C. Jacobson, and Nancy Kaplan Miller, Deputy Attorney General, of counsel, Marlene Zuberman and Donald Parisi, Deputy Attorneys General, on the brief).
Arnold K. Mytelka argued the cause for respondent-cross-appellant Englewood Board of Education (Clapp & Eisenberg, attorneys, Arnold K. Mytelka, Paul L. Tractenberg and Agnes I. Rymer, on the brief).
James S. Rothschild argued the cause for respondent Board of Education of the Borough of Tenafly (Riker, Danzig, Scherer, Hyland & Perretti, attorneys, James S. Rothschild, of counsel and on the brief, Vito A. Gagliardi, Jr., on the letter brief).
Stephen M. Eisdorfer, Assistant Deputy Public Advocate, argued the cause for amicus curiae The Public Advocate of New Jersey (Wilfredo Caraballo, Public Advocate, attorney, Kevin H. Marino, Counsel to the Public Advocate, and Stephen M. Eisdorfer, on the brief).
Bernard K. Freamon, attorney for amici curiae The National Association for the Advancement of Colored People, the New Jersey State Conference of the NAACP, and the Bergen County *422 Branch of the NAACP (Samuel L. Walters, Assistant General Counsel, NAACP, of counsel and on the brief).
The opinion of the court was delivered by LONG, J.A.D.
On this appeal from a decision of the State Board of Education, we are called upon to interpret the term "substantial negative impact" in N.J.S.A. 18A:38-13 (the statute which requires the approval of the Commissioner of Education before a sending-receiving relationship between two school districts may be severed); to revisit the so-called single community doctrine of Jenkins v. Tp. of Morris School District and Bd. of Educ., 58 N.J. 483, 279 A.2d 619 (1971); to explore the power of the State Board to act generally in aid of its jurisdiction, and to assess the State Board's decision to order a regionalization study including some unwilling districts.
We hold that N.J.S.A. 18A:38-13 is not a traditional balancing statute. In assessing an application for severance, the finding of a substantial negative impact on educational quality in one district warrants disapproval of severance, notwithstanding any number of "positive" impacts which severance would bring to the other district. We also hold that under Jenkins, the existence of a "single community" is not a prerequisite to the power of the State Board to bridge school district boundaries where necessary to vindicate the State's policy against segregation. In addition, we confirm the power of the State Board to issue such ancillary orders to school districts in this State as are required to ensure compliance with its policies. Finally, we affirm, as a viable alternative under the facts presented, the State Board's order that a regionalization study take place.

I
Procedurally, the case arose on December 23, 1985, when the Board of Education of Englewood Cliffs (Cliffs) filed a petition with the Commissioner of the New Jersey Department of *423 Education (Commissioner) under N.J.S.A. 18A:38-13, seeking to sever the sending-receiving relationship with the Board of Education of Englewood (Englewood) pursuant to which Cliffs had been sending its high school students to Dwight Morrow High School (DMHS) in Englewood. Englewood opposed the petition and filed a cross-petition seeking to enjoin the Board of Education of Tenafly (Tenafly) from accepting high school students from Cliffs or Englewood. Englewood also asked that the Commissioner regionalize the three municipalities into one district at the high school level. Tenafly sought the dismissal of the cross-petition as to it and Cliffs answered, opposing regionalization. The Commissioner transmitted the matter to the Office of Administrative Law as a contested case pursuant to N.J.S.A. 52:14F-1 to -11. Between January 7, 1987 and October 6, 1987, Administrative Law Judge Kenneth Springer (ALJ) conducted 99 days of hearings.
On April 18, 1988 the ALJ issued an initial decision recommending the denial of Cliffs' petition for severance because of the negative impact which severance would have on the racial balance of DMHS; the denial of an alternative "dual" sending-receiving relationship among Englewood, Cliffs and Tenafly because it offered no real free choice to less affluent Englewood parents; and the denial of Englewood's cross-petition for regionalization or a comprehensive regionalization study because the potential risks of regionalization were greater than the potential rewards. He also recommended that Tenafly be restrained from accepting any students from Cliffs or Englewood not currently enrolled in a Tenafly school. All parties filed exceptions.
On July 11, 1988 the Commissioner issued a decision adopting the ALJ's findings and recommendations. However, he directed that eighth graders from Cliffs, enrolled in Tenafly as of April 18, 1988, be allowed to remain in Tenafly and attend Tenafly High School (THS) should they so desire. In refusing to order regionalization or a comprehensive regionalization study, the Commissioner opined that regionalization is only *424 available where the districts to be regionalized constitute a single community; where the proofs establish that regionalization would be feasible, reasonable and workable; and where regionalization can be accomplished without any practical upheavals. He concluded that Englewood had failed to meet these criteria. Cliffs and Tenafly appealed to the State Board of Education and Englewood cross-appealed.[1]
Subsequently, the Legal Committee of the State Board issued a report essentially adopting the findings and conclusions of the Commissioner, with two important modifications: first, because there was insufficient evidence of the need for regionalization, the Committee recommended that the Commissioner monitor the racial composition of DMHS and report to the State Board periodically with his findings. Second, the Committee recommended that the injunction against accepting Cliffs and Englewood students be extended to all public school boards in the State. Cliffs and Englewood filed exceptions.
On April 4, 1990 the State Board issued a decision which essentially affirmed the findings and conclusions of the Commissioner with some modifications, including those recommended by the Legal Committee. It also directed Cliffs and Englewood to develop a plan, in consultation with the Commissioner and subject to his approval, to encourage their students to attend DMHS. It ordered the Commissioner to monitor the plan and the racial composition of DMHS for five years and to report to it annually as to the effect of the plan on the racial composition of DMHS. The State Board exempted from its decision all students from Cliffs and Englewood attending THS *425 or other public high schools as of the date of the initial decision (April 18, 1988).
Cliffs appealed, challenging the State Board's denial of its petition for severance, the denial of a dual sending-receiving relationship and the injunction. Englewood filed a notice of cross-appeal from the State Board's failure to order regionalization. We granted the motions of the National Association for the Advancement of Colored People (NAACP) and the Public Advocate for amicus status. Englewood filed an application for direct certification to the New Jersey Supreme Court which was denied.
During the pendency of this appeal, Cliffs and Englewood submitted their plans to encourage enrollment at DMHS to the Commissioner. On June 5, 1991 the Commissioner published his first annual report which suggested certain changes in those plans and recommended that the State Board order a regionalization study because of his doubts as to the effectiveness of remedial measures short of regionalization. On July 3, 1991 the State Board resolved to adopt the Commissioner's recommendations.
On August 5, 1991 Cliffs and Tenafly filed motions for leave to appeal from the State Board's resolution authorizing a regionalization study, claiming that the State Board's resolution violated R. 2:9-1 because of the pendency of the earlier appeal. We granted leave and stayed the resolution pending this review. The appeals were consolidated on September 10, 1991.

II
The record in this case is voluminous. Because the Commissioner and the State Board each essentially adopted the factfinding of the ALJ, his decision will be set forth at length. We will also detail the recommendations of the ALJ and the decision of the Commissioner, even where they differ from the final decision of the State Board, because that counterpoint serves to clarify the State Board's rulings.

*426 A. The Districts

The Borough of Englewood Cliffs is an affluent suburban community of approximately two square miles. According to the 1980 census, it had a population of 5,698, which was 85.0% white, 9.3% Asian, 3.9% Hispanic, and 0.8% black. Cliffs operates two K-8 schools for its students. Because it has no high school facilities, since 1965 Cliffs has had a sending-receiving relationship with Englewood.
Englewood is a more urban community than Cliffs. Approximately five miles square, it had 23,701 residents according to the 1980 census. Of those residents, 44.6% were white, 40.6% were black, 8.8% were Hispanic and 2.8% were Asian. Englewood operates two elementary schools, one middle school and DMHS.
Tenafly, like Cliffs, is a suburban community. It is approximately four-and-one-half miles square and, according to the 1980 census, had a population of 13,552. Of these, 91.3% were white, 4.5% Asian, 3.0% Hispanic and 0.6% black. Tenafly operates four elementary schools, a middle school and THS.
All three districts are considered "affluent" relative to other communities in the county and state. As among themselves, households in Cliffs and Tenafly have much higher incomes than those in Englewood. While Englewood is a heterogeneous community, Cliffs and Tenafly are primarily white with growing Asian populations. All three districts are contiguous.
In addition to sharing common borders, the other significant community ties among the three districts include: some common cultural and recreational facilities (e.g., attendance by Englewood and Cliffs' residents at summer and adult school programs in Tenafly); a common public library for Englewood and Cliffs; common medical facilities; shared road and public transportation links; and common religious services.

*427 B. The Schools

Both DMHS and THS are four-year secondary schools, i.e., grades 9-12. Beginning in the 1988-1989 school year, Englewood had planned to expand DMHS to include eighth grade students; Cliffs intended to continue sending its eighth graders to its own school.

1. DMHS
The school plant consists of two buildings (built in 1931 and 1967) on a well-landscaped, 34-acre campus shared with Englewood's middle school. The older building features an "exceptionally attractive" Gothic facade; the newer building is more austere. In 1985, a state facility planning team inspected DMHS and reported more than 20 deficiencies, ranging from chained and locked exit doors to "crumbly plaster" in class-rooms. Nevertheless, officials did not cite DMHS for any violations, and the ALJ concluded that DMHS "must be deemed in substantial compliance with all applicable building standards." In 1981, Englewood completed a $1.45 million renovation of DMHS and approved a long-term improvement program for the period 1987-1991 at a cost of $2.08 million.
DMHS is a member of the Middle States Association of Secondary Schools and Colleges (Middle States), a voluntary organization which uses an elaborate procedure for accrediting member schools. In 1976, Middle States approved DMHS but offered a list of recommendations for improvements. Although the deadline for re-evaluation was originally to expire in 1986, Middle States granted DMHS three successive one-year postponements and, as a result, re-evaluation was not completed by the time of the hearing; nevertheless, DMHS has never lost its accreditation.
The DMHS teaching staff has appropriate certification and adequate training and experience. In 1986-1987, the 94 teaching staff members were 61.0% white, 32.0% black and 6.0% Hispanic or Asian. A survey showed that teacher morale at DMHS was low in several areas: teachers wanted more input *428 into the decision-making process and improvement of the physical working environment. During the 1980s, administrative instability was a problem at DMHS; three principals were hired between 1980 and 1986. Nevertheless, the qualifications and competence of Richard Segall, the DMHS principal who succeeded to the position in 1986, is unchallenged. With Segall, Englewood mounted a campaign to deal with the problems at DMHS.
At the time of the hearing, the DMHS library totaled approximately 16,000 volumes; however, many of the titles were outdated. The school attempted to increase the effectiveness of its library by extending hours of operation and by increasing (by 300.0%) the amount it spent on printed materials.
DMHS provides a wide range of courses for students of different ability levels and interests, including advanced placement, honors, and enrichment courses. Class size tends to be fewer than 20 students. In 1987, 64.0% of DMHS graduating seniors entered four-year colleges, and of those, almost 50.0% attended colleges rated "very competitive" or above by Barron's Profiles of American Colleges (15th ed. 1986). Between 1986 and 1987 seven DMHS graduates attended Yale University, and a Yale official testified that the university valued the racial and cultural diversity at DMHS so highly that Yale representatives visited DMHS annually. Many of Cliffs' students were enrolled in advanced placement classes at DMHS and excelled academically; in 1986, 22 out of the 23 Cliffs' students who graduated from DMHS went on to college. In addition to college preparatory programs, DMHS offers a substantial industrial arts program, a broad continuum of special education services and a wide range of guidance services.
The SAT scores at DMHS are in keeping with New Jersey averages. However, the DMHS scores on the High School Proficiency Test in 1985, the first year the test was required for freshmen, were substandard. In 1986-1987, however, the scores improved substantially, placing DMHS above the State *429 average in writing and math but slightly below average in reading. In general, those DMHS students who were not college-bound fared worse on standardized tests than average Bergen County high schoolers. Conservative estimates placed the DMHS dropout rate for grades 9-12 at 7.8% in 1986, which was high when compared to the county average of 2.0%-3.0%.
DMHS offers a wide variety of co-curricular activities including athletic teams, honor societies, debating and public affairs clubs, dramatic and musical productions, and school publications. Cliffs' students actively participate in these programs; their degree of participation exceeds that of their Cliffs' peers at THS.
Historically, DMHS has placed special emphasis on proper student behavior and, under Segall's leadership, instituted new policies to reduce the number of students who cut classes and engaged in other wrongful behavior. Attendance has been a major concern. Although DMHS saw a rise in attendance from 88.5% in 1985 to 90.8% in 1986-1987, its ultimate goal is 95.0%. Disciplinary out-of-school suspensions and the number of police and fire department calls dropped substantially between 1981 and 1987. No substance abuse incidents were reported in 1985 or 1986. On balance, the ALJ concluded that there was no foundation for rumors that students' safety and well-being were compromised at DMHS. In general, expert and lay witnesses alike described DMHS as a very good school.

2. THS
Completed in 1972, THS is a modern, well-maintained facility on a 28-acre tract abutting a stream. The interior is pleasant and cheerful, and the school features a library/media center with 28,000 books, well-equipped science and computer laboratories, student-teacher conference rooms, and a television studio. Like DMHS, THS offers a wide array of co-curricular activities.
At the time of the hearing, THS teachers had a slight edge over DMHS teachers in terms of experience and advanced degrees. The THS faculty was, however, characterized by a *430 lack of ethnic diversity (in 1986-1987, 85 of its 87 teachers were white), reflecting the THS student and Tenafly Borough populations generally. Like DMHS, THS has experienced problems with administrative turn-over and teacher morale. Teachers have complained that they lack input as to decisions affecting them and do not receive proper recognition for their efforts.
Because the overwhelming majority of THS students are college bound (83.0% of THS graduating seniors entered four-year colleges in 1987), THS emphasizes college preparation. It offers limited industrial arts classes, and sends its vocationally motivated students to the Bergen County Technical Education Center on a half-day basis. It does not have a full spectrum of special education programs and offers a conventional guidance program emphasizing college admissions.
Attendance at THS was 95.9% during the 1984-1985 school year. THS uses an innovative approach to discipline, giving qualified students freedom to move about the school facilities during unscheduled periods. In 1984-1985, THS reported three incidents of drug use, although it later admitted having concealed a number of other such incidents that year. The ALJ opined that the disparity between the number of drug incidents at THS and those reported at DMHS might have been due to greater monitoring at THS.[2]

C. The Relationship between the Districts

In October 1965, Cliffs and Englewood executed a 10-year sending-receiving contract to begin in 1967. The agreement essentially obligated Cliffs to send its public high school students to DMHS and required that Englewood maintain DMHS' accreditation and confer with Cliffs "on matters of mutual concern to the High School program." Cliffs was obligated to pay Englewood for the cost of educating its students.
*431 Every year between 1970 and 1976 Cliffs sent approximately 60.0% of its graduating eighth graders, or approximately 60 to 70 students, to DMHS. The remaining Cliffs' eighth graders chose to attend private schools. During these years, the total number of Cliffs' students attending DMHS averaged approximately 245 per year. During the middle 1970s, however, Cliffs became dissatisfied with the sending-receiving relationship. In 1977, rather than renew the relationship and because applicable law made terminations of such relationships subject to the Commissioner's approval, Cliffs petitioned the Commissioner to sever the relationship so that it could explore the establishment of sending-receiving relationships with other districts. Englewood opposed the severance. Cliffs eventually withdrew its petition, apparently because it was unable to support its allegation that DMHS was not providing a good education.
In 1978, Cliffs commissioned Francis A.J. Ianni and others, to study "the community's attitudes towards their educational programs" ostensibly because of the decline in the number of Cliffs' students who were attending public school generally. In 1979, the Ianni study concluded that the Cliffs' community was dissatisfied with the class sizes and atmosphere in the lower grades, and the academic preparation in the middle grades. The study also showed that, at the high school (DMHS) level, Cliffs' parents were mostly concerned with racial balance, discipline and educational standards.
In the late 1970s, newspaper articles emphasizing the negative aspects of DMHS began to appear. These newspaper accounts contributed to the growing public perception that DMHS had serious problems and to the declining enrollment of Cliffs' students at DMHS. During this period, the question of severance became a political issue; at one point all of the candidates for Cliffs' school board were in favor of severance, and the slate most committed to severance ultimately prevailed in the 1985 election.
*432 Between 1974 and 1982, Cliffs affirmatively encouraged its high school-aged students to attend DMHS. For example, during 1980-1981, "cottage parties" were held between Cliffs and Englewood, at which board members and teachers from DMHS were available to answer questions about the school; however, the program ceased after one year, and by 1982 Cliffs stopped encouraging its students to attend DMHS altogether.
Before 1982, THS was the receiving school for students from Alpine, a wealthy community on Tenafly's northeastern border. Around 1982, Tenafly's superintendent reported to Tenafly that, in an informal discussion with Dr. Harold France, Superintendent of Cliffs' schools from 1973 to 1986, Dr. France had said that it would be "most interesting" if and when Tenafly decided to admit non-resident students on a tuition basis, i.e., admission based on individual tuition agreements with parents outside the district as opposed to a sending-receiving agreement with another district. In 1982-1983, Tenafly instituted a program to admit non-resident students to its public schools, including THS, on a tuition basis. When the program was adopted by Tenafly, Cliffs began providing, upon request, written instructions to the parents of Cliffs' students as to how to apply to THS for admission on a tuition basis, although it did not provide such instructions for any other school.
By 1983-1984 Cliffs had amassed grievances against DMHS as follows: declining attendance of Cliffs' students at DMHS; the belief that DMHS was no longer an effective school; Englewood's plan to begin sending its eighth graders to DMHS, thereby further alienating Cliffs' DMHS students (because they would be at DMHS one year less than Englewood's students); and Englewood's failure to have discussed with Cliffs, in advance, the policy of sending eighth graders to DMHS. In November 1985, Cliffs voted to enter into a sending-receiving relationship with Tenafly; Tenafly reciprocated. Until such time as Cliffs' sending-receiving relationship with Englewood was terminated, however, the THS policy was to accept Cliffs' and other municipalities' students on a tuition basis. The *433 primary factors which THS considered under its private admission program were the academic, disciplinary and attendance records of the applicants. Tuition for 1987-1988 was approximately $5,480.
From the inception of the THS private tuition program through 1986, 59.3% of its private students came from Cliffs and 22.9% from Englewood. In 1986, 76 students came from Cliffs and 16 from Englewood.

D. Racial Composition and Enrollment Trends at DMHS and THS

In general, public school enrollment was down in all three districts and this trend seemed likely to continue. Since 1977, enrollment of Cliffs' students at DMHS dropped dramatically and at a much faster rate than the general decline in the school-aged population. Having averaged approximately 60.0% throughout most of the 1970s, the number of graduating Cliffs' eighth graders attending DMHS fell from a high of 69.0% in 1980-1981 to a low of 4.4% in 1987-1988, or 2.6% of the total DMHS enrollment. In 1982-1983, 1,128 students attended DMHS, of whom only 119 were from Cliffs. In that year the DMHS student body was 31.5% white, 55.5% black, 10.3% Hispanic and 2.7% Asian. In 1987-1988, 799 students made up the DMHS student body, of whom only 21 were from Cliffs. During that year, the racial composition of the DMHS student body had changed to 11.8% white, 66.2% black, 17.8% Hispanic and 3.9% Asian.
After Tenafly's non-resident private admission program began in 1982, the number of Cliffs' students attending THS rose annually while the number of Cliffs' students attending DMHS continued to drop. Table 1 sets forth the enrollment trend between 1982 and 1988:

*434
 TABLE 1
 Cliffs Students Cliffs Students
 School Terms Attending DMHS Attending THS
 1982-1983 119 11
 1983-1984 92 21
 1984-1985 73 33
 1985-1986 60 48
 1986-1987 35 62
 1987-1988 21 76

In addition, following the inception of Tenafly's tuition program, the number of non-resident tuition students from all districts attending THS increased. By 1985-1986, THS had 74 non-resident students, or roughly three times the number of non-resident students enrolled in any other high school district in the State. For example, of the 43 high school districts accepting non-resident students, only 16 had more than five such students.
In 1987-1988, Cliffs' 486 students were 50.8% white, 42.2% Asian, 5.5% Hispanic and 1.5% black. Of the 21 Cliffs' students attending DMHS in 1987-1988, 15 were white, 4 were Asian and 2 were Hispanic. Had Cliffs sent those students to THS instead, it would have altered the composition of DMHS to 10.2% white, 68.0% black, 18.0% Hispanic and 3.5% Asian. Such an alteration would have been a 16.0% loss in the DMHS white student body but would have resulted in only a 1.6% decrease in the proportion of white students at DMHS. Had the sending-receiving relationship been terminated in 1982-1983, 119 students would have been withdrawn from DMHS, rather than the 21 under the 1987-1988 figures. According to the 1980 census figures for school-aged children of Cliffs, in 1982-1983 this would have resulted in an approximately 6.5% decrease in the DMHS white student body.[3]
In 1985-1986, the THS student body of 946 was 84.0% white, 13.4% Asian, 1.3% Hispanic, and 0.6% black. Of the 48 Cliffs' *435 students attending THS in 1986, 38 were white, 8 were Asian and 2 were Hispanic; none was black. In 1987-1988 the THS student body which declined to 891 was 80.7% white, 17.8% Asian, 0.9% Hispanic and 0.6% black.
Englewood's own students had, increasingly over the years, chosen to go to private schools rather than attend Englewood's public schools. Private school alternatives were readily available in the area, including more than 20 non-public secondary schools. According to Dr. France, the student migration away from public schools begins early (i.e., sixth or seventh grade) as parents desire to reserve a place for their children in the upper grades of selective private schools.

E. Causes and Effects of the Migration from DMHS

From the time Cliffs made known its intention to form a sending-receiving relationship with THS and terminate its sending-receiving relationship with Englewood, Englewood argued that the issue was not school quality but race. Englewood's experts, Drs. Michelle Fine and Jerry Jacobs, explained that many white parents perceive integrated schools as inferior, and that this perception is a motivating factor in white parents' decisions as to where to send their children to school. Tenafly's expert, Dr. Eugene Smoley, Jr., acknowledged that both the quality and the perceived quality of a school are what substantially motivate parents' selection. Englewood's experts stressed the educational importance of racial diversity in public schools.
A white Cliffs' resident, a 1986 graduate of DMHS, described her high school experience and related that as an eighth grader in Cliffs' upper school in 1982, she regularly heard her classmates using terms like "Dwight Nigger" and "Black Morrow" to refer to DMHS students. She also described the prevailing Cliffs' misconceptions about DMHS, including fears that female students would be attacked or raped, that students' property would be stolen, and that students would be exposed to rampant drug abuse and unsafe restrooms. On the contrary, she, *436 along with many Cliffs and Englewood parents and students, believed that DMHS was a good, safe school which received wide support for its functions and sports activities from members of both communities.
While Englewood acknowledged that it should have consulted Cliffs with respect to its decision to move its eighth graders to DMHS, it maintained that, throughout the course of its sending-receiving relationship with Cliffs, there was open communication between the two boards and that their relationship was a good one. For example, Englewood involved Cliffs in the search for a new DMHS principal, which ultimately resulted in the selection of Segall. Although he cited several examples of disagreements between the two boards over the years, Dr. France acknowledged that the relationship between the two boards had been professional, and that generally Englewood had kept Cliffs informed of relevant matters and had responded to Cliffs' concerns.
Much of the evidence indicated that if Cliffs' parents were prevented from sending their children to THS, they would not send them to DMHS. This was largely due to the common perception in Cliffs as to problems at DMHS and the resulting "social pressure" on Cliffs' students not to attend DMHS. On the other hand, there was some evidence that certain Cliffs' parents would still enroll their children at DMHS and keep them enrolled there if tuition relationships with THS were enjoined (e.g., in 1988, 3 of 14 Cliffs' eighth graders planning to attend THS said they would attend DMHS if not allowed to go to THS. Out of 25 Cliffs' students who started DMHS in 1982, 23 graduated in 1986).
Cliffs' expert, Dr. Mario Tomei, using the cohort survival projection method (i.e., a methodology based upon the proportion of students attending one grade who were enrolled in the same school in the previous grade), projected that if the Cliffs-Englewood sending-receiving relationship was not severed and DMHS remained a 9-12 grade school, by 1990-1991 there would *437 be 58 white students at DMHS, or 8.8% of the student body; and if the relationship were severed, he predicted that there would be 43 white students at DMHS, or 6.7% of the student body. In an 8-12 grade school, Tomei projected a total of 61 whites without severance, or 7.6% of the student body; with severance, he projected a total of 46 whites or 5.8% of the student body. Unlike Englewood's experts, Tomei projected no secondary loss of middle class Englewood black and Hispanic students as a result of severance.
Dr. Jacobs opined that, in the event of severance, DMHS would be 3.0% white, 1.0% Asian, 77.0% black and 18.0% Hispanic. Along with Dr. Jacobs, Dr. Fine also argued that there would be a secondary impact  i.e., the loss of Englewood white, Asian and middle class black and Hispanic students from DMHS. According to these experts, a decrease in the racial diversity of DMHS and migration of its white students would be widely seen as an acknowledgment that DMHS is an inferior school essentially for the poor and unmotivated student and would also result in a so-called "symbolic loss," which would stigmatize those students still attending DMHS after a severance.

F. Regionalization

Instead of prescribing a definitive regionalization configuration, Englewood proposed several different scenarios, all of which took into account the fact that neither DMHS nor THS is large enough to accommodate the combined districts' student body (1,690). The first scenario centered around the existing structures. One facility could be used for grades 9 and 10 and the other for grades 11 and 12. A second possibility was to create two magnet schools (one for arts and humanities and one for science and math). A third variation was to use each facility as a comprehensive 9-to-12th grade high school but not to assign students to the schools based on residence. Another alternative was to enlarge the THS facility to accommodate all the students. The final possibility was to combine or regionalize *438 the three districts and construct a new high school for the region. The configuration chosen would be dependent upon the region's goals and the resources available.
According to Dr. Jacobs, regionalization of the three districts (taking into consideration the Alpine students currently attending THS) would create a 9-to-12 high school region which would be 48.0% white, 31.0% black, 13.0% Asian and 8.0% Hispanic. Those percentages would be substantially stable for the five-year period 1986 to 1991.
Along with Jacobs, Englewood's expert, Dr. Daniel Knueppel opined that regionalization would not cause substantial "white flight." According to them, regionalization would have many attributes, including: providing affirmative action for the existing THS staff as it merges with the DMHS staff; creating comprehensive social learning for THS students as they interact with the racially and economically diverse student body and faculty at DMHS; solving the problems which both schools have had with declining enrollments; creating one school region with an optimal (i.e., approximately 1500) enrollment; and combining the strengths of the two programs by providing a broader and richer educational experience. All experts substantially agreed that regionalization of the three districts was theoretically feasible, based upon the geographic proximity of the districts, the historical attendance of students across district lines, the general compatibility of DMHS and THS, and the conceivable financial resources available.
There was also testimony as to the negative side of regionalization, including: the cost of building a new school or, in the alternative, the increased costs of running both schools simultaneously as one region; the increased cost and amount of busing; the potential loss of community support and involvement in the schools; a perceived loss of local control over the schools; the potential damage to the proven success of Tenafly's high level of K-12 curriculum articulation; the potential lack of racial diversity and harmony even after regionalization; *439 diminution of staff morale and participation in decisions; diminution of student participation in co-curricular activities, and reduction in the individualized approach to education. Thus, although it was feasible, Cliffs and Tenafly maintained that regionalization was not practical, reasonable or desirable.

G. The ALJ's Findings and Recommendations

From these facts, the ALJ arrived at the following findings on Cliffs' motivation for seeking severance:
Among the reasons why the Cliffs Board might legitimately prefer THS are: (1) A more suitable academic program for most college-bound Cliffs students; (2) Less need for emphasis on discipline and more opportunity for student independence and self-reliance; (3) Nicer and newer school facilities; (4) A better stocked library; (5) Past administrative instability at DMHS; (6) Past failure by the Englewood Board to correct deficiencies over a period of years and (7) Inadequate consultation by the Englewood Board about an important matter affecting the Cliffs students.
He concluded:
Accordingly, the Cliffs Board's request for relief is made in good faith, for what it conceives to be the best educational interests of its students.
However, as to the quality of education at DMHS, the ALJ opined:
Cliffs students at DMHS can get a good solid education which more than adequately prepares them for college and for later life. In addition, DMHS has a broader and more comprehensive curriculum, superior in certain respects to the more narrow focus of THS's curriculum, particularly for students interested in vocational careers or requiring special education services. Recently, the Englewood Board has made headway in correcting many of its past problems.
With respect to the impact of severance on racial balance, he found that:
[B]ecause DMHS is so precariously short of white and Asian students, loss of even a small number of Cliffs students would have a significant impact on racial balance. Seen as a drop in the overall proportion of white students at DMHS, the loss of 15 white Cliffs students would make a difference of 1.6%, seemingly a negligible amount. However, these 15 white students constitute 16.0% of the total of 94 white students presently at DMHS.
The best estimate of enrollment in the foreseeable future came from Dr. Tomei, who used three years of recent data which most accurately reflect current enrollment trends. Projections to the year 1990-91 indicate the loss of 15 white Cliffs students in that year would make a difference of only about 2.0% in the proportion of whites attending DMHS. Again, however, these 15 white students would constitute approximately 25.0% of the total number of *440 white students projected for either a 9-12 or an 8-12 high school. Even if one accepts Dr. Tomei's figures, the impact on racial composition must be regarded as substantial in a school with such a low white and Asian population.
As to secondary loss, the ALJ found:
Use by Dr. Jacobs of seven years of data in projecting enrollments is not improper, but presents an unduly optimistic picture of what may reasonably be expected in light of most recent experience. Furthermore, Dr. Jacobs' dire prediction of wholesale abandonment by Englewood white and middle class families of their own good school system is sheer speculation, unsubstantiated by adequate facts and based on false analogy. Undoubtedly some amount of "secondary" loss would occur if severance were granted, but Dr. Jacobs has not provided a credible basis for quantifying that amount.
More fundamentally, the "secondary" loss argument proves too much. It places an impossible burden in the path of any sending district dissatisfied with the quality of education its children are receiving. Carried to its logical absurdity, the Commissioner of Education would never be able to grant severance from the worst receiving districts, for fear of creating a panic among the local inhabitants. While a sending district may rightfully be held responsible for any negative impact caused by the withdrawal of its students, it should not be blamed if the receiving district's population does not support its own school system.
With respect to educational quality, the ALJ stated:
I find that severance would have a substantial negative impact on the quality of education at DMHS, much greater than any material loss caused by the withdrawal of 21 Cliffs students. In effect, any material losses would be greatly magnified by symbolic losses.
Departure of 21 students, in and of itself, would not seriously impair the educational program at DMHS. Reasonable minds may differ as to what size is "ideal" for a high school, but even a small school of under 800 students is capable of sustaining a quality educational program. Since the Englewood Board possesses the prerogative of reallocating resources to preserve particular courses or to implement other educational priorities, it is speculative to hazard any guess as to which specific courses might be affected by the withdrawal of 21 Cliffs students.
However, Dr. Fine's excellent study substantiates that "any material losses pale by comparison with the symbolic losses" which DMHS would suffer if severance were approved. As that comment implies, the sticking point here is not so much the actual loss of a few students, but what that loss would signify. Those left behind at DMHS would perceive the result as an implicit message that the school is not good enough for whites and Asians, but is acceptable for blacks and Hispanics. Feelings of isolation and inferiority engendered by such perceptions would lower the self-confidence of minority youngsters and be detrimental to their trust in the basic fairness of the educational system. Speaking as a trained psychological observer, Dr. Fine stated that the reaction of black students to this litigation goes beyond mere "disappointment." Black students to whom she spoke uniformly viewed the situation as "betrayal" by *441 the one public institution to which they belonged. Reemergence of the stigma of inferiority associated with segregated school systems would be a regressive development for public education in New Jersey and would have serious repercussions far beyond the immediate parties to this case. Policymakers at the state level must give careful consideration to the negative implications severance would have for future race relations and social cohesiveness, not only at DMHS but also in other schools throughout this state.
To make matters worse, the Cliffs students are not evenly distributed among all socioeconomic groups and ability levels at DMHS. Rather, as Mr. Segall confirmed, the Cliffs contingent represents a disproportionately large number of upper income and high-achieving students who help to motivate and set an example for economically deprived and lower-achieving students. Loss of these particular students, therefore, would have a much greater negative impact on educational quality than their number alone would suggest.
Any charge that the Tenafly Board is not meeting its regulatory responsibility to encourage social learning must be rejected. Proofs establish that THS, with its large Asian and Jewish student population, has a diverse enrollment in the areas of culture, religion and native language. Sufficient opportunity exists within the Tenafly public schools for students to associate and mingle with persons of ethnic and religious backgrounds different from their own, although exposure to blacks and Hispanics or to persons of different socioeconomic status is severely limited. Commendably, the Tenafly school administration does not leave social learning to chance alone, but plays an active role in teaching social learning skills as an integral part of the required curriculum and an essential function of its co-curricular activities. Yet the finding is inescapable that DMHS has a much richer mix of racial and socioeconomic types which contribute to a more stimulating environment and a greater potential for exchange of ideas. Cliffs students who abandon DMHS would be losing a very enriching environment which they would be unable to duplicate at the more racially and socioeconomically homogenous THS.
The ALJ found that severance would not have a substantial impact on Englewood's financial condition or on facilities utilization.
On the subject of Tenafly's tuition policy, the ALJ found:
[T]he Tenafly Board has a novel tuition policy enacted to alleviate the adverse effects of its own declining enrollment. As applied to THS, the policy has many characteristics of a private school placement, including selective entry requirements, higher academic standards and payment of tuition. On its face the policy may not be racially exclusive, but whites and Asians, as a group, are better able to afford the entry fee. In practice, the policy has attracted a disproportionately high number of students residing in the neighboring communities of Cliffs and Englewood. Its practical effect is to drain upper income white and Asian college-bound students from DMHS, subverting that school's efforts to promote racial balance and luring many of its most academically talented students. Existence of the Tenafly tuition policy also creates social *442 pressures among Cliffs students not to attend DMHS, even though it is the assigned public high school for Cliffs residents.
Factually it is immaterial to a determination of this case how many tuition students from Cliffs might decide to go to private or parochial schools after the Tenafly option is foreclosed. THS is not a private institution, regardless of how it has been conducting its affairs. While state education officials do not have the authority to prevent someone from attending a nonpublic school, they do have unchallenged constitutional and statutory responsibility for supervising the public education system. A pernicious practice in the public schools cannot be allowed to continue unchecked simply because otherwise some parents might decide to remove their children from the public school system. Fact-finding should deliberately avoid any inquiry into what choices parents might conceivably exercise if the state's strong policy against segregation in public schools is properly enforced. Otherwise, the process may be misinterpreted as tacit encouragement of flight from the public schools in order to circumvent the law. Thus, it is unhelpful  as well as unseemly  to engage in a numbers game regarding how many of the Cliffs or Englewood students now or prospectively at THS would otherwise go to DMHS. The key facts are that THS enrolls 76 Cliffs students and 16 Englewood students who, by all rights, belong at DMHS if they choose to attend public school. Tenafly's tuition policy seriously undermines the continuing ability of the Englewood district to provide equal educational opportunity to all its students.
He concluded:
Tenafly has been fishing in troubled waters. Bluntly stated, the Tenafly Board has adopted a tuition policy which has the clear effect of enticing white and Asian students away from a nearby public high school already experiencing racial imbalance, thereby contributing to a polarized situation. To accomplish its own ends, the Tenafly Board has instituted selective admissions requirements, including what is tantamount to an income test since only those who can afford to pay are eligible for admission. In what could accurately be called "cream-skimming," the Tenafly tuition policy achieves its intended purpose by attracting more highly motivated and academically competent students from its neighboring school district, at the expense of educational quality at DMHS.
In order to condemn Tenafly's beggar-thy-neighbor policy, it is unnecessary to establish that its adoption was the efficient producing cause of the decline in the number of Cliffs students at DMHS. (On the contrary, the evidence here tends to show that the beginning of the decline predated Tenafly's adoption of its tuition policy, although the decline has since accelerated.) It is enough that the Tenafly Board has set in motion a policy which exploits another district's weaknesses for its own benefit, thereby aggravating a bad situation. By the same token, it is unnecessary to find that the Tenafly Board was motivated by improper racial considerations in order to put a halt to the mischief it has made. Good intentions on the part of a wrongdoer "do not serve to negate the State's involvement in violation of a constitutional duty." Norwood v. Harrison, [413 U.S. 455, 466, 93 S.Ct. 2804, 2811, 37 L.Ed.2d 723, 732 (1973)]. "The existence *443 of a permissible purpose cannot sustain an action that has an impermissible effect." Ibid. Tenafly is hardly in the position of an innocent bystander.
He went on to characterize the Tenafly tuition policy as "repugnant" and "against the law", and opined:
If the Commissioner were to give his blessings to establishment of a new sending-receiving relationship between the Cliffs and Tenafly Boards, it would lend legitimacy to an illegitimate arrangement. In essence, it would put the official state imprimatur on what the Tenafly Board has done. (citation omitted).
The ALJ found that the three municipalities are autonomous and distinct and that:
[T]he disadvantages of regionalization substantially outweigh the advantages. Greatest weight should be given to the risk of causing harm to two functioning districts without obtaining sufficient corresponding benefits. The whole will not necessarily be better than the sum of its parts. It is difficult to imagine forcibly merging two such different high schools without provoking much turmoil and acrimony. Call them "challenges" or "short-term" adjustments if one likes, but nevertheless the disadvantages resulting from regionalization would divert the energies of administrators and teachers from their main job of educating children. Even if one accepts the Englewood Board's contention that the cost estimates of the Tenafly witnesses are grossly exaggerated, the money still would be better spent on improving educational opportunities in the existing districts. As previously indicated, the decision on what is the right course of action must not be based on fear of local opposition to the law. But if the main rationale for the regionalization remedy is to improve racial balance in both schools, then the Englewood Board has not put on a very convincing case that regionalization is the best solution. If the desegregation literature teaches us anything, it is that forced merger of two districts, one predominantly white and one predominantly black, carries the greatest risk of white flight.
The ALJ also rejected a dual sending-receiving relationship between Englewood, Cliffs and Tenafly because it would afford only Cliffs' parents the choice of DMHS or THS, and would deny Englewood parents the same remedy.

H. The Commissioner's Decision

On appeal, the Commissioner approved the ALJ's factfinding and his legal conclusions. In so doing, he reaffirmed the issue of racial balance as one of "utmost importance to the State":
[S]everance of the sending-receiving relationship between the Englewood Cliffs Board and the City of Englewood Board would have a significant negative impact on racial balance notwithstanding the small number of white students from Cliffs in attendance due to the unfortunate trend of the Cliffs parents to withdraw their children from the Cliffs resident enrollment to avoid placement *444 at DMHS. As small as that number of students is, their withdrawal would in fact have a substantial negative impact for although the loss of 15 white Cliffs students would lessen the overall white percentage of students from 11.8 to 10.6%, that loss would reduce the number of white students by 16.0% (15/94) presently at DMHS and in 1990-1991 the percentage decrease would be approximately 25.0%.
....
[T]he Commissioner is at this juncture compelled to put to rest once and for all the belief that because painfully few white students remain in a school due to a pattern of withdrawal by members of the majority of the school community there can be no significant negative impact on racial composition. Thus, not just the few remaining will be considered but the pool of eligible students as well who have withdrawn for whatever reason be it to private school, parochial school or, in this particular case, to a public high school in another community as well. If the State were to limit its consideration to 3 students as the Cliffs Board would have us do, it would be for all intents and purposes rewarding, not combating the withdrawal that has occurred. If such were to be allowed, the sending district would merely have to wait until enrollment is so devastatingly low that it could then argue that because so few students attend the receiving district, withdrawal can't possibly make a difference. This cannot be permitted.
In 1978-79 approximately 60.0% of Englewood Cliffs' students attended DMHS. In the intervening years obvious and dramatic decline in enrollment of Cliffs students at that school has occurred for reasons which, given the circumstances of this matter, must be attributed in large part to what is known in the field to be "white flight." For the Commissioner at this juncture to grant severance to the Englewood-Englewood Cliffs sending-receiving relationship as a matter of public policy would place an imprimatur of acceptance by the State to this flight. (citations omitted).
The Commissioner also agreed with the ALJ's conclusion that a substantial negative educational impact would result from withdrawal:
One need look no further than the United States Supreme Court decision in Brown v. Topeka, [347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954)] to support the ALJ's reliance upon evidence dealing not only with "material loss," i.e., reduction in course offering, effect on curriculum, loss of teaching staff, but also an assessment of impact on the psychosocial dimension of education referred to in this case as "symbolic loss." Notwithstanding the fact that DMHS is not all minority, it is, as previously stated, substantially imbalanced racially; thus, the following passage from the U.S. Supreme Court in Brown has no less bearing in this matter than if DMHS were all minority. It states:
Segregation ... in public schools has a detrimental effect upon the colored children. The impact is greater when it has the sanction of the law; for the policy of separating the races is usually interpreted as denoting the inferiority of the negro group. A sense of inferiority affects the motivation of a child to learn. Segregation with the sanction of law, therefore, has a tendency to [retard] the educational and mental development of negro children and to *445 deprive them of some of the benefits they would receive in a racial[ly] integrated school system.
....
[T]he Commissioner rejects the Cliffs Board's arguments that attempt to justify severance because DMHS was an inferior educational facility at the time the petition was filed and should not, therefore, be held harmless from that. It is clear from the record that this case has been heavily immersed in an effort to cast DMHS as an inferior school, not worthy of its students. It is equally clear that the record does not support this position.
As to the Tenafly tuition policy, the Commissioner agreed with the ALJ that while it did not violate the law, it is "clearly contrary to public policy ... and cannot be allowed to stand":
Although the policy is, on its face, not discriminatory and although it was not adopted for improper motives, this does not mean that it should be allowed to stand insofar as the Cliffs and Englewood Boards are concerned, for the record has made it abundantly clear that the effect of the policy has been exactly what the ALJ denounces, namely, to exacerbate racial imbalance at DMHS by skimming off and luring students who are eligible to attend DMHS. Thus, in that sense it is "repugnant" and a "beggar-thy-neighbor" policy as it affects DMHS.
The Commissioner also concurred with the ALJ that:
[I]t is of no moment that Cliffs parents in this matter have no intentions of sending their children to DMHS. Under Pierce v. Society of Sisters, [268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925)] they are free to send their children to private or parochial school and that right is in no way infringed upon by this decision. There is no right, however, to use N.J.S.A. 18A:38-3 as a mechanism which directly and substantially contributes to racial imbalance at DMHS.
Like the ALJ, the Commissioner rejected the dual sending-receiving relationship in particularly direct terms:
Such a relief would certainly serve to legitimize what has been found to be impermissible in this case, namely, the flight of 76 Cliffs students to THS which has contributed to the serious racial imbalance at DMHS. The establishment of a dual sending-receiving relationship would in essence give legal/State sanction to such flight which must be combated not facilitated. Just as severance of a sending-receiving relationship will not be permitted if substantial negative impact results, neither shall a dual sending-receiving relationship be approved when substantial negative impact results. Allowing Cliffs parents to select between THS and DMHS would only serve to exacerbate on existing serious racial imbalance at DMHS and would impact on educational quality in the same manner as severance.
Further, the Cliffs Board is wrong in its assertion that the flight of Cliffs students has been exonerated because educational reasons for severance were found to have been advanced by the Cliffs Board. As previously stated, no one could seriously believe that racial prejudice and circumvention of integration is *446 not at play in this case. Thus, the Commissioner again emphasizes that even if legitimate educational reasons are advanced for severance or the establishment of a dual sending-receiving relationship, neither will be granted where compelling reasons, such as substantial negative impact on racial composition and educational quality, as herein, outweigh the educational benefits sought by the sending district in a new relationship with another district. While finding that educational reasons existed for the Cliffs Board's request for severance in this matter, such acknowledgment does not detract from the ALJ's determination and the Commissioner's affirmance that DMHS provides a broad, comprehensive educational program which is both thorough and efficient and capable of providing more than adequate preparation for post-secondary education.
The Commissioner rejected regionalization as a remedy because he determined that Englewood failed to meet the criteria enunciated in Jenkins that:
(1) "a single community" exists between (or among) the districts in question;
(2) regionalization is "entirely `reasonable, feasible, and workable'"; and (3) regionalization can be accomplished "without any practical upheavals." Jenkins, supra, [58 N.J. at 505, 279 A.2d 619].
The Commissioner's final order was as follows:
Based on the significant negative impact on racial composition and educational quality that would result if the sending-receiving relationship between the Cliffs Board and the City of Englewood Board were allowed to be severed, the petition for termination filed by the Cliffs Board is hereby denied. Also denied is its request to establish a dual sending-receiving relationship with the Tenafly Board as this would likewise create significant negative impact on racial balance and educational quality.
It is further ordered that the Tenafly Board of Education cease and desist from admitting to its high school on a tuition or other basis any students who are residents of either Englewood or Englewood Cliffs. While the tuition policy on its face is not illegal, the effect under the circumstances of this matter is to exacerbate the precarious racial imbalance at DMHS; thus, the strong State policy against discrimination and segregation must have primacy over any discretionary power granted to a board by N.J.S.A. 18A:38-3. [Bd. of Educ. of Asbury Park v. Bds. of Educ. of the Shore Regional High School District, 1971 S.L.D. 221 (1971), aff'd, 1971 S.L.D. 228 (1971)]. The injunction does not apply to resident students from those districts who were enrolled in and attending either THS or eighth grade in the Tenafly School District on the date of the initial decision in this matter, April 18, 1988. Nor does it apply to any grade level other than that currently or in the future served by THS except that no Englewood or Englewood Cliffs resident student so attending Tenafly in a grade lower than those of its high school shall be allowed to attend THS when he/she reaches that level of schooling. This ruling fully disposes of the issues raised in the Cliffs Board's Motion for Interim Relief submitted on behalf of eighth grade students who were accepted for admission to Tenafly High School for the 1988-89 academic year.

*447 Moreover, the Englewood Board's cross-petition for forced regionalization is denied for failure to demonstrate circumstances comparable to those in the State Supreme Court's decision in Jenkins, supra.

I. The State Board Decision

After receiving the recommendations of its Legal Committee, the State Board reviewed the ALJ's findings as adopted by the Commissioner and essentially agreed with the other fact finders that DMHS offered students a good education which prepared them for college and later life. The State Board also agreed with the ALJ and the Commissioner that termination of the sending-receiving relationship would result in a substantial negative impact on racial balance and education at DMHS. The State Board determined that the loss of 21 Cliffs' students (15 white, 4 Asian, 2 Hispanic) would decrease the DMHS white population by only 1.6%. Apparently troubled by this figure, it said:
Viewed in isolation at that particular point in time, this change [a loss of 21 Cliffs students] might not in itself constitute a substantial negative impact on the racial composition of the student population attending Dwight Morrow. Nor, as set forth in the decisions below, would the loss of the 21 Englewood Cliffs students have affected the structure or substance of the educational program provided by Dwight Morrow.
Thus, were the circumstances of this case so limited, we might have reached a conclusion different than the Commissioner's. However, N.J.S.A. 18A:38-13 requires that any determination with respect to a requested change in designation must be based upon consideration of "all the circumstances" (emphasis added), and, consequently, the language of the statute precludes us from taking such a narrow view.
The State Board thus decided to approach the issue from a broader perspective than the ALJ and the Commissioner, and examined the effect of the THS tuition program and the migration of Cliffs students over a period of years. Had Cliffs requested termination in 1982, the year THS initiated its tuition plan when only 11 Cliffs' students attended THS, severance from DMHS would have involved 119 students instead of 21, and would have resulted in a 6.5% decrease in white students at *448 DMHS as opposed to the 1.6% decrease of 1987-1988.[4] Under those circumstances, the State Board would not have permitted severance in 1982-1983 "absent a compelling reason."
Although it noted that "there [was] no fixed balance between racial and national origin groupings that, from an educational perspective, [could] be considered ideal for all communities" the State Board concluded that:
[T]o sanction termination of the sending-receiving relationship between Englewood and Englewood Cliffs, we would be condoning a concentration of blacks and Hispanics that is sharply out of balance with the composition of the society in which those students must function. See Booker v. Bd. of Educ. of Plainfield, 45 N.J. 161 [212 A.2d 1] (1965). Further, the concentration of minority students would be at such level as to allow Dwight Morrow to be characterized as a minority school with the attendant "sense of stigma and resulting feeling of inferiority" cited by the Court in Booker and upon which the Brown decision rests.
It therefore denied Cliffs' petition for severance because of the "balance between racial and national origin groupings that would exist" in the wake of termination, and "the negative educational implications" for DMHS which would necessarily follow severance:
[A]s a matter of educational policy, we could not condone the level of concentration of minority students attending Dwight Morrow by sanctioning the change in designation sought here. In this respect, we emphasize that:

*449 Educational considerations are primary in eliminating school segregation. The elimination of racial imbalance is not to be sought as an end in itself but because such imbalance stands as a deterrent and handicap to the improvement of education for all.
New Jersey State Board of Education, A Statement of Educational Policy, November 5, 1969.
The State Board also denied the application for the establishment of a dual sending-receiving relationship, which would have allowed Cliffs the option of DMHS or THS, essentially for the same reasons. According to the State Board, merely denying Cliffs' petition would not reverse or correct the increasing trend toward greater racial imbalance at DMHS. Since 1982, the year Tenafly initiated its tuition program, there had been a steady increase in the number of white Cliffs and Englewood students who chose to attend THS rather than to attend DMHS or private schools and, according to the State Board, as a result of that trend the proportion of DMHS minority (black and Hispanic) population rose from 65.8% in 1982-1983 to 84.0% by 1987-1988. At the same time, the THS white pupil population was 80.7% white and only 1.5% black or Hispanic.
The State Board concluded that there was a cause and effect to this trend. Although it found that Tenafly had not initiated the tuition program with a discriminatory intent, it opined that its powers were not limited to cases involving evil motives. Acknowledging that it had no affirmative obligation to redesign school districts in order to establish racial balance, the State Board reasoned that because Cliffs had effectively raised the issue, it must either address the question of reversing the trend or accept a role in perpetuating the accelerating racial imbalance by its failure to act. Under the circumstances, the State Board determined that it had a duty to institute measures designed to ensure that high schoolers from Cliffs and Englewood would attend DMHS, their assigned school, if they attended any public high school. In order to discharge that duty, it restrained Tenafly and all other public school districts from accepting Cliffs or Englewood high-schoolers even though no other public school districts had sought to participate in this *450 case. At the same time, it directed Cliffs and Englewood to develop a plan to encourage parents of the two districts to send their children to DMHS. The State Board felt that these mildly intrusive remedies had at least the potential for efficacy.
In reviewing the Commissioner's denial of Englewood's cross-petition for compulsory regionalization or for a regionalization study, the State Board laid to rest the Commissioner's suggestion that regionalization may only be directed in cases where the districts constitute a "single community." Instead, it opined that, based upon the State Constitution and implementing legislation, it clearly had the power to order multi-community regionalization where "necessary to vindicate our State's policy against segregation, and where to do so was `reasonable, feasible and workable'" (quoting Jenkins, supra, 58 N.J. at 505, 279 A.2d 619). Nevertheless, the State Board refused to exercise its power to order regionalization "at this juncture." It concluded that Englewood had failed to show that remedies short of regionalization would not be effective.
Acknowledging that it could not compel students to go to public as opposed to private schools, the State Board noted that had the Cliffs and Englewood students attending THS in 1987-1988 attended DMHS, their designated school, the DMHS student population would have been multi-racial and multi-cultural even if not equally balanced (i.e., 16.0% white, 62.0% black, 16.0% Hispanic and 6.0% Asian). Because such a student population mix might afford DMHS students the educational advantages of a heterogeneous student population, the State Board focused its remedy on ensuring that high schoolers from Englewood and Cliffs would attend DMHS if they attended any public school. As an example of the potential of its remedy, the State Board referred to the lack of evidence that Englewood and Cliffs' parents were increasingly sending their high-school-aged children to private schools, which led it to conclude that a remedy which required those children to attend their designated school, if they attended any public high school, would likely be effective. However, because it recognized that it had a responsibility *451 to correct the growing racial imbalance at DMHS and that its remedies might not sufficiently improve the racial balance of DMHS in the long run, it directed the Commissioner to monitor the composition of the DMHS pupil population for five years and to report annually as to the effectiveness of its remedy. Cliffs appealed and Englewood cross-appealed.

J. The Regionalization Study

On June 5, 1991, the Commissioner made his first report to the State Board. He outlined the proposals of each of the districts and an enhanced compromise plan. In so doing, he found that the situation at DMHS was on a downward slide:
Perhaps the clearest indicator of the deterioration in the relationship between Cliffs and Englewood is the enrollment figures for Cliffs students in attendance at DMHS. In the 1982-83 academic year, 119 Cliffs students attended DMHS. That figure fell to: 92 for the 1983-84 academic year, 73 for the 1984-85 academic year, 60 for the 1985-86 academic year, 34 for the 1986-87 academic year, 23 for the 1987-88 academic year, 13 for the 1988-89 academic year, 16 for the 1989-90 academic year and 13 for the 1990-91 academic year. With the exception of the negligible increase seen in 1989-90, there has been a steady decline in the number of Cliffs students attending DMHS each year. In fact, only 8 or 9 Cliffs students are projected to attend DMHS in 1991-92.
Cliffs' graduating eighth graders are obviously not attending DMHS. In 1987, out of a potential class of 45, only 3 students went to DMHS. In 1988 the respective figures were 30 and 5; in 1989, 42 and 2. In 1990 Cliffs had 38 8th graders; 1 went to DMHS. This year Cliffs has 32 eighth graders in its school; none have elected to matriculate at DMHS in the fall.
Significantly, the decline in Cliffs' student enrollment in DMHS is not attributable to a concomitant decrease in Cliffs' own student population. Moreover, since Cliffs' student population is primarily white and Asian, it is those groups which are severely underrepresented at DMHS.
The Commissioner noted the "evident reluctance" of the parties to resolve the dispute over the plans which spoke "volumes." He therefore recommended a comprehensive nine-point plan emphasizing early grade level exchanges between the districts as a way of increasing respect among the students and promoting better understanding of the DMHS programs, in order to lay the groundwork for increased enrollment of Cliffs' students at DMHS. Because the districts had been unable to stanch the flow of Cliffs' students into placements other than DMHS, the Commissioner also recommended that a regionalization *452 study be undertaken by a consulting firm selected by the Department of Education to work under the guidance and supervision of the Bergen County Superintendent of Schools. "The regionalization study should explore the potential for establishing a regional school district including Cliffs, Englewood and Tenafly by examining potential configurations, available facilities, transportation options, racial impact, and fiscal considerations."
The State Board accepted these recommendations in its July 3, 1991 resolutions but modified the scope of the proposed regionalization study to "include all potential configurations K-12 which would achieve the State's policy by correcting, among other things, the imbalance of racial and national origin groupings" at DMHS "as expeditiously as possible." By our leave, Cliffs and Tenafly appeal from this resolution.

III
The starting point for any discussion of the issues involved in this case is the State's fundamental policy in favor of equal educational opportunity. Since 1875, the New Jersey Constitution has mandated that:
The Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in the State between the ages of five and eighteen years.
N.J. Const. art. VIII, § 4, ¶ 1. Public education must enable the least advantaged school child to compete, on a fair basis, with the most advantaged. Abbott v. Burke, 119 N.J. 287, 374-75, 575 A.2d 359 (1990); Robinson v. Cahill, 62 N.J. 473, 513, 303 A.2d 273 (1973), cert. denied, 414 U.S. 976, 94 S.Ct. 292, 38 L.Ed.2d 219 (1973). Such a scheme will not tolerate discriminatory treatment. Over a century ago, our Legislature first expressed this policy against discrimination in public education. L. 1881, c. 149, codified as N.J.S.A. 18A:38-5.1. Later, the delegates to our constitutional convention made the policy a fundamental right in the Constitution of 1947:

*453 No person shall be denied the enjoyment of any civil or military right, nor be discriminated against in the exercise of any civil or military right, nor be segregated in the militia or in the public schools, because of religious principles, race, color, ancestry or national origin.
N.J. Const. art. I, ¶ 5. The Legislature has consistently resounded this theme in enactments, including the New Jersey Law Against Discrimination which proscribes discrimination in "any kindergarten, primary and secondary school, ... high school, ... or any educational institution under the supervision of the State Board of Education, or the Commissioner of Education of the State of New Jersey." N.J.S.A. 10:5-5(l); see also N.J.S.A. 18A:36-20; N.J.S.A. 18A:7A-4.
The Commissioner of Education has been "vested with broad power to deal with the subject," Booker v. Bd. of Educ. of Plainfield, 45 N.J. 161, 173-74, 212 A.2d 1 (1965), because of the educational importance of eradicating segregation and discrimination in the public schools:
In a society such as ours, it is not enough that the 3 R's are being taught properly for there are other vital considerations. The children must learn to respect and live with one another in multi-racial and multi-cultural communities and the earlier they do so the better. It is during their formative school years that firm foundations may be laid for good citizenship and broad participation in the mainstream of affairs. Recognizing this, leading educators stress the democratic and educational advantages of heterogeneous student populations and point to the disadvantages of homogeneous student populations, particularly when they are composed of a racial minority whose separation generates feelings of inferiority. [45 N.J. at 170-71, 212 A.2d 1].
Booker reprised an earlier pronouncement of our Supreme Court on the educational importance of racial balance. In Morean v. Bd. of Educ. of Montclair, 42 N.J. 237, 200 A.2d 97 (1964), in which a lottery reassignment program the Commissioner instituted in place of neighborhood school assignment was affirmed, the Court recognized the harm done to white and minority children by racial segregation, announcing that sound educational and legal principles do not allow for segregation "with its inherent inequalities of educational opportunities and its withholding of the democratic and educational advantages of heterogeneous student populations." Id. at 242-43, 200 A.2d 97 (citations omitted).
*454 These principles were restated in Jenkins v. Tp. of Morris School District and Bd. of Educ., supra, where Morris Township applied to terminate its sending-receiving relationship with Morristown in order to establish its own high school. Although the Commissioner had the power to deny termination under N.J.S.A. 18A:38-13, he held that the statute had no application "`once a school district provides its own high school facilities'" as Morris Township proposed to do. Jenkins, 58 N.J. at 503, 279 A.2d 619. The Supreme Court rejected the Commissioner's restriction on his authority:
The Commissioner has been appropriately charged with high responsibilities in the educational field and if he is faithfully to discharge them in furtherance of the State's enlightened policies he must have corresponding powers. The Legislature has here granted them in broad terms and it would disserve the interests of the State to permit their administrative narrowing which in effect represents not only a disavowal of power but also a disavowal of responsibility. [Id. at 504, 279 A.2d 619].
The Court went on to recall its opinion in Booker where "we sympathetically applied our constitutional and statutory policies towards the elimination of racial segregation or imbalance." Jenkins, 58 N.J. at 496, 279 A.2d 619.
In Jenkins, the Court not only ruled that the Commissioner erred in refusing to take suitable steps toward preventing Morris Township from withdrawing its students from Morristown High School, but also held that de facto segregation, resulting from a concentration of minorities in particular schools as compared to their concentration in the schools of nearby districts, warranted the Commissioner to move "towards effectuating a merger of the Morris Township and Morristown school systems." 58 N.J. at 504, 279 A.2d 619. More particularly, the Court held that to vindicate the state policy against segregation, "governmental subdivisions ... may readily be bridged ..." and unwilling districts regionalized. Id. at 500, 279 A.2d 619. In so doing, the Court opined "that whether or not the federal constitution compels action to eliminate or reduce de facto segregation in the public schools, it does not preclude such action by state school authorities in *455 furtherance of state law and state educational policies." Id. at 498-99, 279 A.2d 619 (citations omitted). It is this "long-standing" and "vigorous" state policy (Booker, supra, 45 N.J. at 173, 212 A.2d 1) which provides the backdrop for our legal analysis.

IV
This is an appeal from the decision of a state administrative agency. Through the comprehensive opinions of the ALJ, the Commissioner and the State Board, the issues presented here have been thoroughly explored by the officials in whom authority over our educational system reposes. See N.J.S.A. 18A:4-1 to -40; N.J.S.A. 18A:6-9,:6-25 to -28; N.J.S.A. 52:14F-1 to -11. See also Hinfey v. Matawan Regional Bd. of Educ., 77 N.J. 514, 525, 391 A.2d 899 (1978); In re Tenure Hearing of Tyler, 236 N.J. Super. 478, 484-85, 566 A.2d 229 (App.Div. 1989), certif. denied, 121 N.J. 615, 583 A.2d 315 (1990); Bd. of Educ. of Merchantville v. Bd. of Educ. of Pennsauken, 204 N.J. Super. 508, 512-13, 499 A.2d 523 (App.Div. 1985); Theodore v. Dover Bd. of Educ., 183 N.J. Super. 407, 412-13, 444 A.2d 60 (App.Div. 1982); Piscataway Tp. Bd. of Educ. v. Burke, 158 N.J. Super. 436, 441, 386 A.2d 439 (App.Div.), appeal dismissed, 79 N.J. 473, 401 A.2d 230 (1978). Like other administrative decisions, this one is entitled to our deference:
In passing on an administrative agency's exercise of statutorily-delegated responsibility, we accord it a strong presumption of reasonableness. We may not substitute our judgment for the wisdom of agency action if that action is statutorily authorized and not arbitrary or unreasonable. As long as the action is within the fair contemplation of the enabling statute, that action must be accorded a presumption of validity and regularity. If there is any fair argument in support of the agency's action or any reasonable ground for difference of opinion among intelligent and conscientious officials, "the decision is conclusively legislative, and will not be disturbed unless patently corrupt, arbitrary or illegal." Where special expertise is required, as in this case, an even stronger presumption of reasonableness exists. [IFA Ins. Co. v. New Jersey Dep't of Ins., 195 N.J. Super. 200, 207-08, 478 A.2d 1203 (App.Div.), certif. denied, 99 N.J. 218, 491 A.2d 712 (1984) (quoting Flanagan v. Civil Service Dep't, 29 N.J. 1, 12, 148 A.2d 14 (1959)) (citations omitted)].
*456 See also In re Tenure Hearing of Tyler, supra, 236 N.J. Super. at 484, 566 A.2d 229; Bd. of Educ. of Merchantville, supra, 204 N.J. Super. at 512, 499 A.2d 523. An agency's exercise of statutorily delegated responsibility is accorded an even stronger presumption of validity where, as here, it has been given discretion to determine the specialized procedures for its tasks. Van Dalen v. Washington Tp., 120 N.J. 234, 244-45, 576 A.2d 819 (1990).
It is true that, where an issue is purely one of law, we normally do not accord the same deference to the agency determination. Parsippany-Troy Hills Educ. Ass'n v. Bd. of Educ. of Parsippany-Troy Hills Tp., 188 N.J. Super. 161, 165, 457 A.2d 15 (App.Div.), certif. denied, 94 N.J. 527, 468 A.2d 182 (1983). However, it is equally true that where an agency is responsible for enforcing a statute, its interpretation will "be accorded considerable weight" on appeal. Bd. of Educ. of Merchantville, supra, 204 N.J. Super. at 512, 499 A.2d 523 (citing Service Armament Co. v. Hyland, 70 N.J. 550, 561, 362 A.2d 13 (1976)).
It goes without saying that an agency's factual determinations are presumptively correct and will not be upset absent a showing that they are arbitrary, capricious or unreasonable. Bd. of Educ. of Branchburg v. Bd. of Educ. of Somerville, 173 N.J. Super. 268, 274, 414 A.2d 259 (App.Div. 1980) (citing Thomas v. Bd. of Educ. of Morris Tp., 89 N.J. Super. 327, 332, 215 A.2d 35 (App.Div. 1965), aff'd, 46 N.J. 581, 218 A.2d 630 (1966)). Such determinations must be accepted by us if supported by substantial credible evidence. Matter of Warren, 117 N.J. 295, 296-97, 566 A.2d 534 (1989); In Re Petition of Hackensack Water Co., 249 N.J. Super. 164, 174, 592 A.2d 250 (App.Div. 1991); Thomas v. Bd. of Educ. of Morris Tp., supra, 89 N.J. Super. at 332, 215 A.2d 35.
*457 In light of these standards, and upon a complete review of this record,[5] we have concluded that the determinations of the State Board that severance should be denied because it would result in a substantial negative impact at DMHS; that a dual sending-receiving relationship should be denied for the same reason; that across the board injunctions were required to reverse the trend of accelerating imbalance at DMHS; and that a regionalization study should be implemented, were based upon "sufficient credible evidence on the record as a whole" and should be affirmed. R. 2:11-3(e)(1)(D); see also Thomas v. Bd. of Educ. of Morris Tp., supra, 89 N.J. Super. at 332, 215 A.2d 35.

V
Pursuant to N.J.S.A. 18A:38-11, "[t]he board of education of every school district which lacks high school facilities within the district ... shall designate a high school or high schools..." outside of the district for the education of its high school age pupils. This "sending-receiving relationship" is a *458 contract between the two districts for educational services to be provided in exchange for a fixed tuition payment. See N.J.S.A. 18A:38-8. Unlike an ordinary contract, however, termination of a sending-receiving relationship is subject, not just to the desires of the parties, but also to the approval of the Commissioner of Education:
No such designation of a high school or high schools and no such allocation or apportionment of pupils thereto, heretofore or hereafter made pursuant to law, shall be changed or withdrawn, nor shall a district having such a designated high school refuse to continue to receive high school pupils from such sending district except upon application made to and approved by the commissioner.... [N.J.S.A. 18A:38-13].
The point of requiring the Commissioner to approve severance is obvious: to avoid a situation in which a long-standing sending-receiving relationship could be terminated at the whim of one district to the detriment of the other. Implicit in the statute is a stability principle  a recognition of the fact that, in engaging over the long-term in a sending-receiving relationship, school districts achieve something of an angle of repose which should not lightly be placed into disequilibrium, at least not without an objective review of the consequences of the proposed action. It is the Commissioner who brings to bear his expertise in evaluating a severance request.
We have previously recognized the significance of the Commissioner's role in a sending-receiving context in our decision in Bd. of Educ. of Merchantville, supra. That case involved a sending-receiving termination request which the Commissioner and the State Board denied. 204 N.J. Super. at 510-11, 499 A.2d 523. In reviewing the termination of a fixed-term sending-receiving relationship, pursuant to N.J.S.A. 18A:38-20, we broadly interpreted the Commissioner's supervisory role:
Reading N.J.S.A. 18A:38-13 in the context of the Commissioner's expansive powers satisfies us that it was intended to provide the Commissioner with continuous supervisory powers over all sending-receiving relationships, whether created by fixed-term contracts or not, to provide stability to such relationships by permitting their dissolution only for good and sufficient reason. [204 N.J. Super. at 513, 499 A.2d 523].
*459 Although the Legislature amended the statute after Merchantville, the amendment in no way restricted the important position of the Commissioner in the decision-making process.[6]
In assessing whether to grant severance, the Commissioner is called upon to consider the legislative mandate of N.J.S.A. 18A:38-13:
Prior to submitting an application the district seeking to sever the relationship shall prepare and submit a feasibility study, considering the educational and financial implications for the sending and receiving districts, the impact on the quality of education received by pupils in each of the districts, and the effect on the racial composition of the pupil population of each of the districts. The commissioner shall make equitable determinations based upon consideration of all the circumstances, including the educational and financial implications for the affected districts, the impact on the quality of education received by pupils, and the effect on the racial composition of the pupil population of the districts. The commissioner shall grant the requested change in designation or allocation if no substantial negative impact will result therefrom.
Prior to 1986, N.J.S.A. 18A:38-13 provided that a sending-receiving relationship could only be severed upon a showing of "good and sufficient reason" with the burden of proof squarely on the petitioning district. Bd. of Educ. of Haworth v. Bd. of Educ. of Dumont, 1950-1951 S.L.D. 42, 43 (1950). In amending the statute, the Legislature omitted the "good and sufficient reason" standard and substituted the "no substantial negative impact" rule. According to the statement of the amendment's sponsor, its purpose was to:
[M]odify the standard to be applied by the Commissioner of Education when a local board of education applies for permission to alter or terminate a sending-receiving relationship with another board.... The commissioner is required to grant the requested change in designation or allocation if no substantial negative impact will result. [Assembly Statement accompanying Assembly Bill No. 2072, L. 1986, c. 156 (1986)].
The Assembly Education Committee Statement accompanying the bill points out that the old law "does not specify the criteria which the commissioner should consider in making a judgment" *460 on severance, but that the new law requires that he consider many factors, including the racial composition of the schools and the educational impact of severance. Assembly Education Committee Statement accompanying Assembly Bill No. 2072, L. 1986, c. 156 (1986). In prior decisions, the State Board has held that the amended statute "does not represent a departure from the legislative policies embodied in the statutory scheme ... prior to [the] amendment ... but rather gives further definition to the balance between those policies." Bd. of Educ. of Cranbury v. Bd. of Educ. of Lawrence, 1987 S.L.D. 1, 24 (1987), appeal dismissed, No. A-4253-86 (App.Div. April 28, 1988) (citation omitted).
The spin Cliffs places on the amendment is that it was designed to make termination of a sending-receiving relationship "easier" to obtain; it argues that the State Board erred in not according it the benefit of this amelioration. The source of this interpretation is apparently a newspaper article published contemporaneously with the bill's enactment:
"This law will make it easier for ... school districts to terminate an agreement once another district no longer best fits its needs." [Pat R. Gilbert, New Law Enables Schools to End `Sending' Pacts, Trenton Times, November 25, 1986 (quoting the legislative sponsor)].
We see a distinct difference between the original law and the amended version. Under the former, the Commissioner could reject severance if he was not satisfied that there were "good and sufficient reason[s]" to justify it. The amendment provides that he "shall" grant severance "if no substantial negative impact will result." We can conceive of circumstances (for example, where a petitioning district has weak reasons for severance but where no substantial negative impact will occur) in which the new version of the statute would constitute a lesser burden on the movant than the old. However, whether the new law is or is not "easier" essentially begs the question presented here  was it arbitrary or unreasonable for the State Board to conclude that the grant of severance would result in a substantial negative impact on DMHS? Cliffs argues that it *461 was, contending that, other than the negative racial impact on DMHS, there are no additional negative impacts presented by termination, and that if the State Board had "weighed" the positive impacts of severance against the single negative racial impact, it would have concluded that the statutory burden was met. This argument is wide of the mark in several respects.
First, Cliffs' vision of a positive impact is quite different from our own. It claims, for example, that two positive impacts of severance are the forestalled deterioration of the Cliffs' upper school from which Cliffs' parents have historically removed their children to assure them places in alternatives to DMHS, and the availability to Cliffs' students of the "superior academic environment" of THS. Each of these so-called affirmatives is exclusively beneficial to Cliffs and fails to give a shred of consideration to the effect of severance on the students at DMHS. More importantly, the THS formula for educational success is to segregate a group of homogeneous students from relatively affluent families in a school run completely by white teachers, which stresses college preparation and does not even provide a full spectrum of special education programs for the students who require them. This scheme utterly fails to account for the considerable value which we have long placed on social and educational development in an atmosphere in which children with differences learn to celebrate and not fear them. Booker, supra, 45 N.J. at 170, 212 A.2d 1. THS, with its minuscule black and Hispanic population, is not a realistic forum for interaction among the children of different races. On the other hand, DMHS, which every factfinder has held to be a very good school, provides its education within such a heterogeneous framework. Thus Cliffs' positive impacts claim is problematic at best.
Moreover, even if we were to concede Cliffs' vision of what is positive, the result would be the same. Whatever differences exist between the old law and the new, one thing is certain  N.J.S.A. 18A:38-13 is not a traditional balancing statute. *462 See Bd. of Educ. of Belmar v. Bd. of Educ. of Asbury Park, 1989 S.L.D. 1, 96 (1989); Bd. of Educ. of Absecon v. Bd. of Educ. of Pleasantville, 1988 S.L.D. 14, 45 (1988); Bd. of Educ. of Cranbury v. Bd. of Educ. of Lawrence, supra, 1985 S.L.D. at 17. The act lays out a series of factors to be considered by the Commissioner as part of a feasibility study including: the educational (offerings) and financial (budgetary) implications for both districts, the impact on the quality of education in both districts, and the effect on the racial composition of the pupil population in both districts. The Commissioner's responsibility is to reach an "equitable" determination  one that is fair to both districts  keeping in mind his responsibility as the ultimate educational authority in the State. See N.J.S.A. 18A:38-13. To be sure, the Commissioner may engage in weighing and balancing within each of the stated categories. For example, he may assess whether financial losses outweigh financial gains in a proposed move or whether racial balance is improved in one district more than it is negatively affected in the other. However, he is not free to weigh the overall positive and negative impacts of severance or to determine that a substantial negative impact he has found in any category is "outweighed" by a positive impact in another. The reason for this is that the legislatively prescribed considerations do not exist in a vacuum but are inextricably bound up with the question of what kind of an education is to be provided. A substantial negative impact in one category necessarily implicates an overall educational quality issue. The focus of the Commissioner's inquiry is whether a substantial negative impact exists at all; if it does, severance is to be denied. This is the way the Commissioner and the State Board have previously interpreted the statute. Bd. of Educ. of Asbury Park, supra, 1989 S.L.D. at 96; Bd. of Educ. of Absecon, supra, 1988 S.L.D. at 45. There is simply no place in this analysis for the weighing of positive impacts once a substantial negative impact has been found. See Bd. of Educ. of Asbury Park, supra, 1989 S.L.D. at 9-10 (ALJ), 96 (Commissioner).
*463 Cliffs alternatively argues that the State Board could not reasonably have concluded that a substantial negative impact would result from severance because this record shows that a grant of severance would have caused no more than a 1.1% reduction in the DMHS white population at the time of the application. One prong of this argument is that the State Board should not have reached back into the relationship between the parties in assessing Cliffs' application. Not so.
Although the State Board was not compelled to approach the case from this perspective, it was well within its discretion in doing so. What occurred prior to the actual petition for severance provided a perspective which the State Board legitimately viewed as critical to an understanding of the present state of affairs and to an assessment of the effects of withdrawal. In deciding cases in the past, the State Board has never ignored circumstances which have contributed materially to a situation under review. See, e.g., In re Bd. of Educ. of Milltown to Terminate its Sending-Receiving Relationship with the Bd. of Educ. of New Brunswick, 1976 S.L.D. 854, aff'd, 1976 S.L.D. 863, appeal dismissed, No. A-2456-74 (App.Div. December 2, 1976). There was certainly no reason for it to do so in this case in which the facts relied on by the State Board were not "history" at all, but reality  that Cliffs began its withdrawal from DMHS long before it filed its application with the Commissioner. Indeed, if we were to accept Cliffs' approach to the issue, a district would be rewarded for quiet complicity in long-term white flight with a payoff for delayed discovery: the inability of the State Board to consider what had already occurred in formulating its remedy.
Having taken the long view, the State Board's conclusion that the negative impact was substantial, as a matter of fact, is unassailable. In reaching this conclusion, the State Board considered the cumulative effect of Cliffs' failure since 1982 to encourage its students to attend DMHS; the fact that if severance had been sought in 1982 when the real exodus began, *464 it would have resulted in a 6.5% reduction in the white DMHS population; the succor which Cliffs received from the Tenafly tuition policy which "lured" and "enticed" a disproportionate number of high achieving white and Asian Cliffs students away from DMHS; the direct relationship of that policy to the accelerated decline in white enrollment at DMHS; the concentration of blacks and Hispanics at DMHS which would exist in the wake of severance, a concentration "sharply out of balance" with the composition of the society in which the students would function; and the feelings of anger and inferiority which would be engendered in those who remained. In essence, the State Board considered the combination of long-term actual loss and symbolic loss as a substantial negative educational impact on the students at DMHS.
Cliffs contends that, taken together, these factors do not give rise to a substantial negative impact. This view first overlooks the mandate of N.J.S.A. 18A:38-13 that racial balance is an important consideration in evaluating the potential destabilizing effect of severance. Indeed, that language was engrafted onto the statute specifically to avoid withdrawals for discriminatory purposes which would have the effect of recreating segregated school systems with their inherent inequality of educational opportunity.
More to the point is the interrelationship between racial balance and education  a connection Cliffs persists in omitting from its reasoning. These are not isolated factors. They are different sides of the same coin. Our Supreme Court long ago recognized this principle in Morean and Booker, cases decided in the afterglow of Brown v. Bd. of Educ., 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). A generation later, the promise of Brown remains only partially fulfilled and the optimism it engendered has been sorely tested. In these circumstances, the principle enunciated in Morean and Booker is more hallowed than ever: when children of all races learn to live with and respect each other in school at an early age, education is *465 enhanced and the groundwork is laid for future participation of all in the "mainstream" of human affairs.
On this backdrop, Cliffs' suggestion that the only negative impact of severance was insubstantial is plainly wrong. Indeed, the projected negative impact of severance on DMHS was so substantial that, even if we were to concede Cliffs' characterization of N.J.S.A. 18A:38-13 as a balancing statute, the puny positive impacts projected by Cliffs would clearly have been overwhelmed by the far-reaching and long-term negative impact on DMHS. The same reasoning applies to the State Board's denial of the creation of a dual sending-receiving relationship between Englewood, Cliffs, and Tenafly which would have had the same effect as severance.[7]

VI
We turn next to Cliffs' contention that the State Board's denial of severance violated its rights under Section 1 of the Fourteenth Amendment to the United States Constitution, which provides that:

*466 No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. [U.S. Const. amend XIV, § 1].
The Fourteenth Amendment proscribes discrimination on the basis of race and extends to all state action which distinguishes between its citizens solely in racial terms. See, e.g., City of Richmond v. J.A. Croson Co., 488 U.S. 469, 492-95, 109 S.Ct. 706, 720-21, 102 L.Ed.2d 854, 880-82 (1989); Davis v. City and County of San Francisco, 890 F.2d 1438, 1445 (9th Cir.1989), cert. denied, ___ U.S. ___, 111 S.Ct. 248, 112 L.Ed.2d 206 (1990). The parties here sharply disagree both as to the characterization of the State Board action and the level of judicial scrutiny to be applied under the Fourteenth Amendment. This is important because the nature of a legislative classification directs the standard of review. State v. Bulu, 234 N.J. Super. 331, 343, 560 A.2d 1250 (App.Div. 1989).
Regulation of a fundamental right or disparate treatment of a suspect class is subject to strict scrutiny, meaning that it must further a compelling state interest and there must be no less-restrictive means to accomplish that goal. City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313, 320 (1985); Massachusetts Bd. of Retirement v. Murgia, 427 U.S. 307, 311-13, 96 S.Ct. 2562, 2566-67, 49 L.Ed.2d 520, 524-25 (1976); San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 16-17, 93 S.Ct. 1278, 1287, 36 L.Ed.2d 16, 33 (1973); Brown v. City of Newark, 113 N.J. 565, 573, 552 A.2d 125 (1989); Barone v. Dep't of Human Services, 107 N.J. 355, 365, 526 A.2d 1055 (1987) (citing Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971)); State v. Bulu, supra, 234 N.J. Super. at 343-44, 560 A.2d 1250. Regulation which involves a semi-suspect class or which indirectly affects a fundamental right, is subject to an intermediate level of scrutiny, must further an important governmental interest and be substantially related to the achievement of that objective. City of Cleburne v. Cleburne Living *467 Center, supra, 473 U.S. at 441, 105 S.Ct. at 3255, 87 L.Ed.2d at 321; Craig v. Boren, 429 U.S. 190, 197, 97 S.Ct. 451, 457, 50 L.Ed.2d 397, 407 (1976); Greenberg v. Kimmelman, 99 N.J. 552, 565, 494 A.2d 294 (1985); State v. Bulu, supra, 234 N.J. Super. at 344, 560 A.2d 1250. In all other cases, the rational basis test applies, requiring only that there be some rational connection between the state action and the legitimate state interest sought to be achieved. See Massachusetts Bd. of Retirement v. Murgia, supra, 427 U.S. at 312, 96 S.Ct. at 2566, 49 L.Ed.2d at 524; Drew Associates of New Jersey, LP v. Travisano, 122 N.J. 249, 258-59, 584 A.2d 807 (1991); Barone v. Dep't of Human Services, supra, 107 N.J. at 364-65, 526 A.2d 1055 (citing Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970)).
Cliffs naturally argues that strict scrutiny is required because it views the State Board's decision as "based upon the race of the Cliffs' student population and nothing else." According to Cliffs, what the State Board has done here is to "seize" children from across district lines on the basis of their race to avoid racial imbalance at DMHS. Such a characterization may apply to some case, but not the one before us. The sending-receiving side of this case is not a test of the right of the Commissioner and the State Board to force the exchange of students between districts which previously had no such policy among themselves. What is at issue here is a long-standing legal relationship between Cliffs and Englewood pursuant to which the children of Cliffs have crossed school district borders voluntarily over the last quarter century. It is Cliffs which seeks to alter that status quo. In order to do so, it must meet the requirements of N.J.S.A. 18A:38-13, which apply to all school districts seeking to sever a sending-receiving relationship. The statutory standards are not per se under attack here. Thus it is hard to follow Cliffs' argument as to "seizure" of children across district lines or the creation of any classification, let alone a suspect racial one.
*468 What is at issue here is an administrative adjudication based upon legislatively mandated considerations including the intertwined concepts of the quality of education and the racial composition of the schools in question. Is it race conscious as Cliffs contends? The answer is yes. Is race consciousness prohibited? The answer is no. It is only the per se use of race as a determinant which creates a classification subject to strict scrutiny under the Fourteenth Amendment. Porcelli v. Titus, 431 F.2d 1254, 1257 (3d Cir.1970), cert. denied, 402 U.S. 944, 91 S.Ct. 1612, 29 L.Ed.2d 112 (1971). The United States Constitution does not prohibit states from taking race into account in educational decisions. Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986). Our Supreme Court so concluded in Morean v. Bd. of Educ. of Montclair, supra, which is controlling here, and which found "no substance to the petitioners' contention that since its plan of relocation had some racial motivation it was violative of the fourteenth amendment." 42 N.J. at 243, 200 A.2d 97. See also Schults v. Bd. of Educ. of Teaneck, 86 N.J. Super. 29, 40-41, 205 A.2d 762 (App.Div. 1964), aff'd, 45 N.J. 2, 210 A.2d 762 (1965).
Cliffs' reliance on City of Richmond v. J.A. Croson Co., supra, Wygant, supra, and Regents of the University of California v. Bakke, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), a series of recent United States Supreme Court decisions which invalidated true racial classifications, is misplaced. In Bakke, supra, a white medical school applicant was denied the opportunity to compete for 16 seats of the entering class solely because of his race. 438 U.S. at 272-79, 98 S.Ct. at 2734-42, 57 L.Ed.2d at 759-64. In City of Richmond v. J.A. Croson Co., supra, whites were denied the opportunity to compete for a fixed percentage of public contracts solely because of their race. 488 U.S. at 478-82, 109 S.Ct. at 713-15, 102 L.Ed.2d at 871-75. In Wygant v. Jackson Bd. of Educ., supra, there was a preferential layoff system in which minority teachers were retained over non-minority tenured teachers solely *469 because of their race. 476 U.S. at 269-72, 106 S.Ct. at 1845, 90 L.Ed.2d at 266-67. In an effort to analogize this case to the cited precedent, Cliffs argues that the "State Board attempted to reserve places for whites at DMHS in order to reduce minority representation." This is a distortion of what actually occurred. No amount of ingenuity can bring this case within the interdiction of Bakke, Wygant and Croson which involved absolute racial preferences in a zero-sum context. Indeed, a majority of Justices in Bakke specifically concluded that to achieve diversity, race is an appropriate consideration in school admission decisions. 438 U.S. at 318-20, 98 S.Ct. at 2762-63, 57 L.Ed.2d at 788-90 (Powell, J.); Id. at 324-25, 98 S.Ct. at 2765-66, 57 L.Ed.2d at 792-93 (Brennan, White, Marshall and Blackmun, JJ., concurring). In Lige v. Town of Montclair, 72 N.J. 5, 367 A.2d 833 (1976), our Supreme Court unambiguously explained the difference between a quota issue and the matter under review:
It is important to recognize the difference between rectifying a racially improperly constituted school, Jenkins v. Tp. of Morris School District and Bd. of Ed., 58 N.J. 483 [279 A.2d 619] (1971), for no one has a right to attend a segregated school; whereas an applicant for a job or a promotion has a right to be considered and judged irrespective of race. [72 N.J. at 24, 367 A.2d 833].
If a classification exists here at all, which we doubt, it is not racial but geographic  all Cliffs' students are involved equally. The designated public high school for Cliffs' residents remains DMHS, and the injunction precludes other public school boards from accepting any Cliffs' student, regardless of race. Conversely, the injunction does not preclude other public school boards from accepting, for tuition, students who reside outside of Cliffs and Englewood. As such, the standard to be applied is a rational basis standard which requires only that there be some reasonable connection between a legitimate state interest and the action taken. See Drew Associates, supra, 122 N.J. at 258-59, 584 A.2d 807; Barone v. Dep't of Human Services, supra, 107 N.J. at 364-65, 526 A.2d 1055.
*470 Even if we were to concede that the State Board's decision constitutes a race-based classification with respect to white Cliffs' students, that remedy would still pass constitutional muster. The State's compelling interest in diversity in the public schools as a function of education cannot be seriously questioned. Jenkins, supra, 58 N.J. at 498-99, 279 A.2d 619 (citing Booker, supra, 45 N.J. at 170-71, 212 A.2d 1). Concomitantly, the State's interest in "assuring that public dollars, drawn from the tax contributions of all citizens, do not serve to finance the evil of private prejudice" is beyond dispute. City of Richmond v. J.A. Croson Co., supra, 488 U.S. at 492, 109 S.Ct. at 720, 102 L.Ed.2d at 881 (comparing Norwood v. Harrison, 413 U.S. 455, 465, 93 S.Ct. 2804, 2810, 37 L.Ed.2d 723, 731 (1973)). The only question then is whether the decision is as narrowly tailored as it could be; was it the least restrictive means to accomplish the goal?
Cliffs contends that the State Board's action was overbroad because it ordered an inter-district remedy even though no inter-district violation had been found, contrary to Milliken v. Bradley, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974). This argument misapprehends Milliken. There, the Supreme Court struck down a remedy imposed by the District Court to relieve de jure school discrimination in Detroit. The District Court had ordered a consolidation of Detroit and 53 suburban school districts because it had determined that a Detroit-only remedy would not alleviate the effects of the segregation. Id. at 729-34, 94 S.Ct. at 3119-22, 41 L.Ed.2d at 1082-85. There was no evidence of any discrimination in the suburban districts. While Cliffs is correct when it contends that Milliken limits inter-district relief to inter-district violations, it errs in its attempt to apply that holding to this case. Milliken did nothing more than define the limits of a federal court's equity jurisdiction; the decision did not circumscribe in any way a state's authority to effectuate its own educational policies. Indeed, as the Supreme Court stated in Hills v. Gautreaux, 425 U.S. 284, 296, 96 S.Ct. 1538, 1545, 47 L.Ed.2d 792, 802-03 (1976):

*471 The District Court's desegregation order in Milliken was held to be an impermissible remedy not because it envisioned relief against a wrongdoer extending beyond the city in which the violation occurred but because it contemplated a judicial decree restructuring the operation of local governmental entities that were not implicated in any constitutional violation. [Emphasis added].
The same reasoning is applicable to Cliffs' reliance on the recent United States Supreme Court decision in Freeman v. Pitts, 503 U.S. ___, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992). Like Milliken, Freeman is a study of the limits of a federal court's continuing supervisory authority over a court-ordered plan to combat de jure segregation. Freeman addressed the margins of federal court authority where de jure segregation has undergone a period of transition to de facto segregation. Freeman v. Pitts, 503 U.S. at ___, 112 S.Ct. at 1447, 118 L.Ed.2d at 136 (citing Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 31-32, 91 S.Ct. 1267, 1283-84, 28 L.Ed.2d 554, 575 (1971)). In the federal jurisdiction context, this is an important issue because federal courts are powerless to remedy de facto segregation. See Freeman v. Pitts, 503 U.S. at ___, 112 S.Ct. at 1443-48, 118 L.Ed.2d at 136-39; Bd. of Educ. of Oklahoma City Public Schools v. Dowell, 498 U.S. ___, ___, 111 S.Ct. 630, 637-38, 112 L.Ed.2d 715, 728-30 (1991); Pasadena City Bd. of Educ. v. Spangler, 427 U.S. 424, 436, 96 S.Ct. 2697, 2704, 49 L.Ed.2d 599, 608 (1976). Nothing in Milliken or Freeman suggests that the limits there expressed are applicable to judgments of the highest state educational authority as to how to carry out longstanding state policies in favor of racial balance as a function of a thorough and efficient educational system. Whatever the Federal Constitution compels, it does not preclude such action by the State. Jenkins, supra, 58 N.J. at 498-99, 279 A.2d 619. Further, it is clear that the State Board here has applied the least intrusive remedy. It has not yet required consolidation of two unrelated districts; it has only enforced a long-standing voluntary, preexisting inter-district relationship.
*472 Moreover, and notwithstanding that a particularized finding of intentional discrimination is not a prerequisite for state remedies for racial imbalance, Jenkins, supra, 58 N.J. at 506, 279 A.2d 619; Booker, supra, 45 N.J. at 170-78, 212 A.2d 1, such findings are the leitmotif which runs throughout the decisions here. The Commissioner and the State Board clearly found that Cliffs' residents had engaged in white flight from DMHS, which flight was facilitated by the Tenafly Board's private tuition policy and by the Cliffs Board. As the Commissioner noted: "[n]o one could seriously believe that racial prejudice and circumvention of integration is not at play in this case." Likewise, the State Board concluded that to deny relief here would be to make the State a "passive participant" in private discrimination. No more specific findings are required. Under the circumstances, the State Board's action clearly passes strict scrutiny; it goes without saying that the lesser burdens are also met.
We turn next to Cliffs' New Jersey constitutional claim. Article I, paragraph 1 of the State Constitution protects against the unequal treatment of those who should be treated alike. Barone v. Dep't of Human Services, supra, 107 N.J. at 367, 526 A.2d 1055 (quoting Greenberg v. Kimmelman, supra, 99 N.J. at 568, 494 A.2d 294). When analyzing equal protection claims under the New Jersey Constitution, a balancing test similar to a Fourteenth Amendment analysis is applied. Barone, 107 N.J. at 368, 526 A.2d 1055. The weights in the balance are the nature of the affected right, the extent to which the government's restriction intrudes upon it and the public's need for the restriction. Greenberg v. Kimmelman, supra, 99 N.J. at 567, 494 A.2d 294; State v. Bulu, supra, 234 N.J. Super. at 344, 560 A.2d 1250. In describing the application of the analysis under the State Constitution, our Supreme Court has said that the focus is on "whether there is an appropriate governmental interest suitably furthered by the differential treatment" embodied in the action complained of. Barone, supra, 107 N.J. at 368, 526 A.2d 1055 (quoting Borough of Collingswood *473 v. Ringgold, 66 N.J. 350, 370, 331 A.2d 262 (1975), appeal dismissed, 426 U.S. 901, 96 S.Ct. 2220, 48 L.Ed.2d 826 (1976)). For the same reasons that we have rejected Cliffs' Fourteenth Amendment claim, we view its New Jersey constitutional analogue as insubstantial. As we have said, our State's education policy is advanced by the State Board's decision here which is a measured response to the problem presented.
It should not go unsaid that we agree with Englewood and the amici that Cliffs' invocation of the Fourteenth Amendment here turns that constitutional provision "on its head." The Fourteenth Amendment and its New Jersey counterpart are meant to shield our citizens against state sanctioned racial discrimination. To suggest that they prohibit a state from applying a statute, specifically addressed to remedying the educationally pernicious evils of white flight, racial imbalance, and de facto segregation in the schools is, at best, cynical.

VII
Cliffs complains that, even if the State Board properly denied its petition for severance, it exceeded its authority in enjoining Tenafly and other non-party school districts from accepting Cliffs' students on a tuition basis. With respect to Tenafly, Cliffs claims that the State Board's injunction violated Tenafly's statutory right to exercise discretion as to which interdistrict students it accepts. It also argues that enjoining the THS tuition program will in no way increase the white student population at DMHS. Cliffs also asserts that the State Board's injunction denies due process to any school district not joined as a party.
The Commissioner has broad constitutional and legislative powers concerning public education. N.J.S.A. 18A:4-10; Piscataway Tp. Bd. of Educ. v. Burke, supra, 158 N.J. Super. at 441, 386 A.2d 439. These powers must be interpreted sufficiently expansively to correspond with his "high responsibilities" in the education field. Jenkins, supra, 58 N.J. at 504, *474 279 A.2d 619. N.J.S.A. 18A:4-16 concomitantly confers on the State Board all necessary powers "requisite to the performance of its duties." Clearly, under appropriate circumstances, injunctive relief is a power available to the State Board. Bd. of Educ. of Asbury Park v. Bds. of Educ. of Shore Regional High School District, 1971 S.L.D. 221, aff'd, 1971 S.L.D. 228 (1971). Indeed, Cliffs concedes this theoretical power, arguing instead that the injunction was improvidently granted in this case because an injunction, the so-called "strong arm of equity," is an extraordinary remedy not justified by the facts. Van Name v. Federal Deposit Ins. Corp., 130 N.J. Eq. 433, 442-43, 23 A.2d 261 (Ch. 1941), aff'd, 132 N.J. Eq. 302, 28 A.2d 210 (E. & A. 1942). We disagree.
Here, we have affirmed the State Board's determination that the Tenafly tuition policy had a serious negative impact on the racial balance at DMHS. As Tenafly's non-indigenous population increased, the situation at DMHS worsened. Tenafly not only "lured" and "enticed" Cliffs' students by its "beggar-thy-neighbor" policy, and in doing so syphoned off a disproportionate number of high achievers, but also attracted white and Asian Englewood students. Given those findings, the effectuation of the State's constitutional policy in favor of racial balance as a function of the quality of education not only authorized but compelled an injunction against Tenafly. See In re Solid Waste Util. Customer Lists, 106 N.J. 508, 516, 524 A.2d 386 (1987). As to the other school districts (none of which has complained), the State Board's directive was a necessary adjunct to the injunction against Tenafly. Without the directive, the State Board could not ensure total compliance with the educational goals it sought to achieve. Most importantly, the injunction was a critical element of the State Board's attempt to remedy the problem at DMHS by using the least intrusive means. Given the history of this case, a laissez faire attitude, without an injunction, would have doomed these means to failure.

*475 VIII
While a sending-receiving relationship is essentially an education services-for-tuition exchange made between two districts, that arrangement does not alter the structural integrity of either district. Regionalization, on the other hand, involves the formation of an entirely new school district governed by a separate board of education. See Jenkins, supra, 58 N.J. at 504-05, 508, 279 A.2d 619. Regional districts can be formed for all purposes or for limited purposes. N.J.S.A. 18A:13-2. Among the "limited purposes" is the organization of a regional district to operate a high school or high schools only. Englewood has petitioned for the creation of a regional high school district including it, Cliffs and Tenafly. The effect of such a regional district here would be to transfer control over DMHS and THS to a regional school board.
The authority for cross-district regionalization arises out of Jenkins where the Supreme Court expanded on the Booker principle of intra-district regionalization:
It is true that Booker dealt with a community which was wholly contained within a single district fixed by municipal lines whereas here the community involves two districts.
....
As the Supreme Court pointed out in Reynolds v. Sims, 377 U.S. 533, [575] 84 S.Ct. 1362, [1388] 12 L.Ed.2d 506, 535 (1964), political subdivisions of the state whether they be "counties, cities or whatever" are not "sovereign entities" and may readily be bridged when necessary to vindicate federal constitutional rights and policies. See Gomillion v. Lightfoot, 364 U.S. 339, 347, 81 S.Ct. 125, 5 L.Ed.2d 110, 116 (1960); United States v. State of Texas, 321 F. Supp. 1043, 1050-1058 (E.D.Texas 1970); cf. Jackman, et al. v. Bodine, et al., 55 N.J. 371 [262 A.2d 389] (1970). It seems clear to us that, similarly, governmental subdivisions of the state may readily be bridged when necessary to vindicate state constitutional rights and policies. This does not entail any general departure from the historic home rule principles and practices in our State in the field of education or elsewhere; but it does entail suitable measures of power in our State authorities for fulfillment of the educational and racial policies embodied in our State Constitution and in its implementing legislation. Surely if those policies and the views firmly expressed by this Court in Booker (45 N.J. 161 [212 A.2d 1]) and now reaffirmed are to be at all meaningful, the State Commissioner must have power to cross district lines to avoid "segregation in fact" (Booker, 45 N.J. at 168 [212 A.2d 1]), at least where, as here, there *476 are no impracticalities and the concern is not with multiple communities but with a single community without visible or factually significant internal boundary separations. [Jenkins, 58 N.J. at 500-01, 279 A.2d 619].
The ALJ opined that the detriments of regionalization outweighed the benefits. The Commissioner adopted these findings and concluded that Englewood had failed to meet the three-part test established in Jenkins to prevail on the question of whether compulsory regionalization should be ordered: the existence of a "single community"; that regionalization is feasible and workable, and that it can be accomplished "without any practical upheavals." (citing Jenkins, supra, 58 N.J. at 505, 279 A.2d 619). The State Board rejected the Commissioner's legal conclusion (also previously expressed in Bd. of Educ. of New Brunswick v. Bd. of Educ. of Tp. of North Brunswick and Bd. of Educ. of Milltown, 1974 S.L.D. 962, 986 (1974), aff'd, 1975 S.L.D. 1110 (1975)) that Jenkins limited its authority to act to those circumstances where a "single community" exists and specifically concluded that it would not hesitate to order regionalization in a non-single community case where such a remedy was necessary to "vindicate our State's policy against segregation."
Cliffs and Tenafly argue that the single community principle is a part of the fundamental holding of Jenkins and that the State Board erred in dispensing with it. We disagree. A fair reading of Jenkins evidences no intention to restrict its remedial scope to such circumstances. The expansive general principle enunciated in Jenkins was that cross-district regionalization is an available arrow in the Commissioner's desegregation quiver. The Court took pains to explain the importance of this remedy in vindicating our State's Constitutional and statutory policies. It described the municipalities under review (Morristown and Morris Township), as a single community because they were physically, socially, commercially, and governmentally interdependent. 58 N.J. at 485-86, 279 A.2d 619. Most importantly, the Court declared the configuration before it as "probably a unique one in our state." Id. at 485, 279 A.2d 619. *477 It is inconceivable to us that the Court intended its far reaching statement of policy to be limited to a fact pattern which, it recognized, was unlikely to reoccur. That is the interpretation urged by Cliffs and Tenafly. Its effect would be to eviscerate Jenkins, a result we will not allow.
We think the correct interpretation is that cross-district regionalization is available even where a single community does not exist. The facts in Jenkins were happenstance which made the ultimate outcome of that case obvious but did not constitute a requirement for the application of the fundamental case doctrine. In ruling to the contrary, the Commissioner essentially elevated the facts of the case into a principle of law. The State Board has now remedied the misreading, and we fully approve its interpretation.
In so doing, we specifically reject, as did the Supreme Court in Jenkins, the suggestion that principles of home rule and local control are violated by the exercise of the State Board's power in this context. 58 N.J. at 500, 279 A.2d 619. Like parental choice, home rule and local control must yield to the fulfillment of the educational and racial policies in the constitution and statutes of this State.
We also reject Tenafly's suggestion that the Legislature has implicitly overruled Jenkins by enacting statutory measures for the takeover of failing school districts. See Public School Education Act of 1975, N.J.S.A. 18A:7A-34 to -52. Having never been raised below, the argument is not properly before us and, in any event, is not meritorious. The State takeover legislation is a remedy for a failing school district and is essentially irrelevant to Jenkins and the facts presented here. N.J.S.A. 18A:7A-34.
Finally, we note that even if we were to accept the single community requirement as a part of the fundamental holding of Jenkins, it would not bar a regionalization study in this case. Single community is nothing more than a reality principle, reflecting a pre-existing blurring of the municipal *478 boundaries, rendering the bridging of those boundaries less impractical than would ordinarily be the case. 58 N.J. at 500, 279 A.2d 619. This record demonstrates long-term de jure and de facto educational interconnections between Englewood, Cliffs and Tenafly which we deem sufficient to meet the principles informing the single community doctrine.
Cliffs and Tenafly argue that, in any event, regionalization was properly rejected as a remedy because it is neither reasonable, feasible, workable nor educationally sound. In attempting to come to grips with these arguments, it is important to understand what is and what is not before us on the regionalization end of this appeal. As we read this record, although the Commissioner rejected regionalization because Englewood had failed to meet the Jenkins standards (single community, feasibility and no practical upheavals) the State Board made no such findings. It stated:
While we concur that it is neither necessary nor advisable for this agency to actively pursue compulsory regionalization at this point, we do so for reasons different than those expressed by the Commissioner.
and:
In that it has not been shown that more intrusive measures than those we have directed are necessary at this juncture in order to vindicate our State's constitutionally derived policy, we conclude that it would be premature for this agency to pursue compulsory regionalization at this point. [Emphasis added].
From these quotations, it can fairly be argued that the State Board not only rejected the Commissioner's conclusions as to the single community doctrine but also the balance of his conclusions as to Englewood's failure to meet the feasibility and no practical upheaval standards. Plainly there would be no warrant for the State Board to hold out the possibility of regionalization if it had already found regionalization to be an infeasible remedy which would cause undue practical upheavals. It is unnecessary, however, to go so far in interpreting the State Board's ruling. All that need be said from our perspective is that the State Board never reached the substantive issues surrounding regionalization because it was convinced that the measures it put in place would "vindicate the State's *479 constitutionally derived policy against segregation." Indeed, because of the way the case was decided by the ALJ and the Commissioner, no potential regionalization configurations were actually presented to the State Board for consideration. As such, the merits of regionalization are not before us.

IX
Englewood and the amici argue that the remedies originally ordered by the State Board (which did not include regionalization or a regionalization study) should be rejected by us because even if they were completely successful, they would still have left DMHS in a state of unconstitutional racial imbalance. The administrative hearing revealed the following facts relevant to this argument. As of 1987-1988, DMHS was 84.0% black and Hispanic. THS was 1.5% black and Hispanic. Blacks and Hispanics made up only 7.0% of the Cliffs school enrollment. The school population of Bergen County, as a whole, was 6.4% black and 5.6% Hispanic. The most optimistic outcome under the orders issued by the State Board would have been that, within several years, all high school students from Cliffs would attend DMHS. The State Board concluded that under those circumstances, DMHS would remain 78.0% black and Hispanic while THS would remain overwhelmingly white. Put another way, if the State Board's initiatives were entirely successful, the minority enrollment of DMHS would remain more than six times that of the county as a whole and more than 35 times that of Tenafly. The State Board held that this result "might well afford all students who attend Dwight Morrow the educational advantages of a heterogeneous student population" since it would result in DMHS being "both multi-racial and multi-cultural."
Based on these facts, we have doubts about the State Board's original denial of a regionalization study. In Booker, the Supreme Court said that "children must learn to respect and live with one another in multi-racial and multi-cultural communities and the earlier they do so the better." 45 N.J. at 170, 212 *480 A.2d 1. It also declared that the Commissioner has a duty to ensure that such learning occurs in schools that are not de facto segregated and that he must not only eliminate schools that are "entirely or almost entirely Negro," 45 N.J. at 178, 212 A.2d 1, but must also achieve "the greatest dispersal consistent with sound educational values and procedures." Id. at 180, 212 A.2d 1. By focusing on Booker's "multi-racial and multi-cultural" reference instead of the principle of "greatest dispersal", it seems to us that the State Board recast the expansive holding of Booker as the far more limited holding that achieving some minimal racial and cultural diversity will suffice. In so doing, the State Board eviscerated Booker's explicit ban on school segregation. If it had taken no further action, we would likely have intervened on this issue, at least to the extent of requiring an explanation of what educational values and procedures the State Board viewed as counter-balancing the need for greatest dispersal. Because of the later developments, it is unnecessary for us to do so.

X
On June 5, 1991, during the pendency of this appeal, the Commissioner issued his first annual report to the State Board pursuant to the State Board's earlier order. In his report the Commissioner (1) described the efforts which Cliffs and Englewood had made to develop a plan encouraging students to attend their designated high school, (2) set forth his suggestions as to how to improve those plans, and (3) recommended that a regionalization study be begun because he doubted that the State Board's remedial measures would reverse the trend of white migration from the designated high school. On July 3, 1991, the State Board enacted a resolution adopting the Commissioner's recommendations.
On August 5, 1991, Cliffs and Tenafly filed motions pursuant to R. 2:2-4 for leave to appeal from the State Board's July 3 resolution. Their principal claim is that the State Board violated *481 R. 2:9-1 in ordering a regionalization study while this appeal was pending. They also reprise many of the arguments we addressed earlier in urging that the decision to order the study was arbitrary because the State Board has no power to regionalize in these circumstances; that the precedent in this case is violated by the order; that the study violates federal constitutional principles, and that it contravenes the Governor's position on the subject. Englewood counters that the order merely implemented the unstayed April 1990 ruling of the board. We agree with this view. But even if it could be argued that the July 3 ruling had sufficient commonality with the issues on appeal to have warranted a motion by the State Board for a temporary remand to take further action, that motion, if made, would surely have been granted. We thus address the State Board's decision on its merits.
We have previously rejected the argument that the State Board lacks the theoretical power to regionalize unrelated districts and to take race into consideration when doing so. Likewise, we find no merit to Cliffs' claim that the Governor's recent general statement about regionalization has any effect whatsoever on the State Board's authority to fashion an appropriate remedy in a specific case. Further, the suggestion that the regionalization study order violates precedent in this case overlooks the fact that the study was clearly within the intendment of the April 5, 1990 order which authorized the Commissioner to recommend additional measures if he determined that the monitoring process was not yielding results with sufficient alacrity. That is exactly what occurred.
We likewise reject the argument that the order for a study is invalid because there are no "standards" to govern the conduct of such a study. Jenkins gives us those standards: any plan for regionalization must be "reasonable, feasible and workable." Clearly, the State Board is the proper arbiter of when regionalization is appropriate:

*482 It is axiomatic that the Legislature may commit a subject to the judgment of an administrative agency with a statement of the goal to be reached rather than the path to be followed to reach it. The exigencies of modern government have increasingly dictated the use of general rather than minutely detailed standards. [In re Trenton Bd. of Ed., 176 N.J. Super. 553, 562 [424 A.2d 435] (App.Div. 1980), aff'd, 86 N.J. 327 [431 A.2d 808] (1981) (citations omitted)].
Indeed but for the politically and emotionally charged subject matter here, it is hard for us to imagine any reasonable person challenging the power of the Board to "study" an issue committed to its overall authority.
Englewood and the amici oppose further study of this issue on wholly different grounds. They urge that the six years this case has been pending is long enough to wait for a remedy. We agree but the necessity of further study is evident and no action by us is feasible in the absence of a ruling by the State Board in the first instance. As the State Board argued before us, "[u]ntil a full study has been completed the appropriateness of regionalization cannot be determined." Branchburg, supra, 173 N.J. Super. at 276, 414 A.2d 259. Further, as we understand it, Englewood, Cliffs and Tenafly are not the only districts which will be the focus of the study. If an ultimate regionalization plan is approved, these objectors may not even be a part of it.
Naturally, every effort should be made to complete the study quickly because the amount of time which has elapsed since the inception of this case has been inordinately long. The stay of the State Board's resolution authorizing a regionalization study is thus dissolved. There is simply no reason to delay the study further even if the appeal is pursued. We are, however, in no position to assess, at this point, the extent of the study necessary (other than to observe that Englewood and Tenafly have already been exhaustively reviewed) or to place specific time limits on the completion of this difficult task. If it appears that a further unreasonable delay is occurring during the study, any party may return to us to apply for a more definitive time table.
We affirm the denial of termination of the sending-receiving relationship between Cliffs and Englewood. We affirm the *483 denial of the establishment of a dual sending-receiving relationship between Englewood, Cliffs and Tenafly. We affirm the injunction against all public school boards in the state accepting students from Cliffs or Englewood. We affirm the order denying regionalization at the present time, and we affirm the order for a regionalization study.
NOTES
[1] On November 1, 1988 the State Board granted the motion of "A.S.," a Cliffs' seventh grader attending school in Tenafly, to intervene in the proceedings on the question of whether the Commissioner's eighth-grade cut-off was arbitrary. (The State Board ultimately held that the eighth-grade cut-off was not arbitrary, which holding is of no moment here because the intervenor is not participating in the appeal.)
[2] Significantly more evidence was introduced and is recapitulated as to DMHS because it is the quality of that school which Cliffs made the primary issue in the case.
[3] The record did not include a specific racial breakdown of Cliffs' students at DMHS during 1982-1983.
[4] Cliffs argues that the State Board decision was based upon the misimpression that 119 Cliffs' students attending DMHS in 1982 were white when in fact only 100 (119 x .84) were white. One hundred is the correct figure. The State Board opinion indicated that if all 119 Cliffs' students had left DMHS in 1982 a 6.5% decrease in the white student body would have resulted. Despite this arguably misleading reference, it is clear that the State Board actually used the correct figure in calculating the percentage decrease in white DMHS students at 6.5%:

Total DMHS students (1982): 1,128
Total white DMHS students (1982): 355
Total white Cliffs students at DMHS (1982): 100
(1) Percent DMHS white population with Cliffs white students:
 355 of 1,128 = 31.5%
(2) Percent DMHS white population without 100 Cliffs white students:
 255 of 1,028 = 25.0%
(3) Percent decrease (i.e., (1) minus (2)) = 6.5%
[5] Englewood asserts that the State Board erred by failing to supplement the record with minutes of a Cliffs Board meeting at which there was "disclosure" that Cliffs' attempt to sever the sending-receiving relationship was racially motivated. According to two local newspaper articles from July 1988, at a closed meeting the president of the Cliffs Board of Education stated that this lawsuit was unwinnable and that "[Cliffs] will have lost the case, and it is a racial issue." Because it claims that the minutes are, in effect, already public, Englewood argues that there is no cause for not fully disclosing them and making them part of this record. Neither the State Board's opinion nor Englewood's brief refer to this issue as having been raised previously and, in fact, although Englewood cites R. 2:5-5(b), it has apparently made no formal motion to supplement the record, thus rendering this issue improperly before us on this appeal. Even if we were to reach the merits, we would decide it against Englewood. According to the news article, Cliffs' president said that this "is a racial issue." That declaration is no more "an admission" of Cliffs' racial motivation than it is a comment on the public perception of the case. More importantly, Englewood does not claim that the minutes were voluntarily disclosed, and Cliffs has set forth credible and uncontradicted evidence that the statement, if made, was made during a litigation strategy session with its attorney and was therefore privileged. See N.J.S.A. 10:4-12 to -13. There is thus no warrant for supplementation.
[6] The Commissioner's decision is subject to appeal to the State Board of Education which "may in its discretion affirm, reverse, revise or modify the determination appealed from." N.J.S.A. 18A:38-14.
[7] Cliffs also asserts that the State Board was wrong in applying the 1980 census figures without considering the potential pool of white students from Englewood who were not attending DMHS, their designated high school, but who were going to private schools. It urges that the State Board's decision fails to address the root cause of declining white enrollment at DMHS  Englewood whites' rejection of their own designated high school  and, in fact, punishes white Cliffs' parents for the actions of their Englewood counterparts. Cliffs contends that when the total potential white student pool from Englewood is taken into consideration, the percentage decline in white enrollment due to a hypothetical Cliffs withdrawal in 1982 could have been no greater than 4.0%. The State Board did not consider those Englewood students who attended private schools because N.J.S.A. 18A:38-13 only applies to public school students and the Commissioner's authority is solely applicable to public education and the public school system. N.J.S.A. 18A:4-21 to -40. Because Englewood parents, like all parents, are free to send their children to private schools, Pierce v. Society of Sisters, 268 U.S. 510, 534-36, 45 S.Ct. 571, 573-74, 69 L.Ed. 1070, 1077-78 (1925), the State Board properly confined its analysis to those students over which it had authority and control.